**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS C. and PAMELA McINTOSH,       :

                     Plaintiffs,     :     CIVIL ACTION NO. 1:06-CV-
                                      1080-LTS-RHW

      - against -          :

STATE FARM FIRE & CASUALTY CO. and :
FORENSIC ANALYSIS & ENGINEERING
CO., et al.,                     :

                    Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANT STATE FARM FIRE AND CASUALTY COMPANY'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS....................................................................................................i

INTRODUCTION .........................................................................................................1

FACTUAL BACKGROUND............................................................................................4

ARGUMENTS AND AUTHORITIES.............................................................................14

I.     The Rigsby Sisters Interposed Unwarranted Objections of the Attorney-Client and Work Product Privileges in Numerous Instances Where These Privileges Are Facially Inapposite..........................................................................................................15

II.    The Rigsby Sisters Are Not Entitled to Claim Work Product or Attorney-Client Privilege Because Their Conduct and That of Their Counsel Undermines the Adversary Process and Violates the Ethical Rules and Canons.........................................19

     A.     A Lawyer Who Strategically Hires a Material Witness as a "Trial Consultant" and Illicitly Obtains an Adverse Party's Documents Cannot Claim Privilege as a Matter of Law ......................................................................19

     B.     The Unethical Conduct of Scruggs and the SKG Vitiates Any Putative Privilege ......................................................................................................23

     C.     The Rigsby Sisters' Retention of Scruggs Falls within the Crime-Fraud Exception to the Attorney-Client and Work Product Privileges..........................26

III.    State Farm Is Entitled to All Documents, Reports, and Data Compilations upon Which the Sisters Base Their Opinion..................................................................27

IV.    The Rigsby Sisters' Vague Allusions to a "Law Enforcement" or "Statutory" Privilege Are Not Supported by Facts in the Record..........................................29

V.     The Rigsby Sisters Should Be Compelled to Comply with State Farm's Document Requests..................................................................................................31

CONCLUSION............................................................................................................35

Defendant State Farm Fire and Casualty Company ("State Farm") respectfully submits this Memorandum of Law in Support of its Motion to Compel, pursuant to Rule 37(a)(2)(B) of the Federal Rules of Civil Procedure and Rule 37.1 of the Uniform Local Rules for the Northern and Southern Districts of Mississippi.

## INTRODUCTION

On April 27, 2007, this Court entered an Order denying Cori and Kerri Rigsby's Motion to Quash Deposition Subpoenas and Document Demands issued to them by State Farm in this action. Although Cori and Kerri Rigsby (the "Rigsby Sisters" or "Sisters") appeared at their respective depositions, they regularly refused to answer State Farm's questions, asserting the attorney-client and/or work product privileges, a putative "law enforcement privilege," and a privilege ostensibly derived from an unidentified federal statute. Further, though neither Sister provided a privilege log, both failed to produce a single document, based largely on vague and general assertions of attorney-client and work product privilege. All of the Rigsby Sisters' objections are meritless; all should be overruled.

As a threshold issue, many of the privilege objections the Sisters interposed are facially inapposite. More fundamentally, the pertinent case law makes it abundantly clear that where, as here, a lawyer strategically hires a material witness as a "trial consultant," or illicitly obtains an adverse party's documents, the right to claim a privilege is lost. Such conduct has been universally condemned by the courts because it threatens judicial integrity and the adversary process, violates numerous ethical rules and canons, and falls squarely within the crime-fraud exception to the attorney-client and work product privileges.

Here, Cori and Kerri Rigsby are former employees of E.A. Renfroe and Co., Inc. ("Renfroe"), a firm that provides insurance adjusters to insurance companies following a catastrophic event. The Rigsbys were both employed by Renfroe to adjust and mediate claims by State Farm's policyholders in the aftermath of Hurricane Katrina. In order to perform their duties, the Sisters were each provided with

a State Farm computer and password, which gave them access to confidential policyholder information and claim files. Kerri Rigsby was the team manager for the adjuster who handled the McIntoshes' claim that is the subject of this lawsuit.

While working for Renfroe, the Rigsby Sisters forged a relationship with attorney Richard F. Scruggs ("Scruggs"), with whom they met regularly. By their own account, the Sisters surreptitiously began copying State Farm's confidential documents and funneling them to Scruggs for use in his civil litigations against State Farm. Indeed, one of the first documents they gave to Scruggs was an engineering report prepared in conjunction with the McIntoshes' claim. The Rigsby Sisters' clandestine activities went on for several months, culminating in what they have referred to as a "data dump" – a weekend event in which the Sisters enlisted the help of several friends and printed out or copied a total of some 15,000 pages of State Farm's documents and claim files, which they then handed over to Scruggs. Scruggs, in turn, rewarded the Sisters for their cooperation by paying them an annual salary of $150,000 each to serve as "litigation consultants" for Scruggs and his associates at the Scruggs Katrina Group (the "SKG").

Now Scruggs is attempting to invoke the attorney-client privilege and work product doctrine to erect a wall of secrecy around his relationship with the Rigsby Sisters. He asserts that all of his meetings with the Sisters are privileged communications because he was representing them while they were pilfering State Farm's documents for his use. And he claims that all of the Sisters' "consulting" activity at the SKG falls under the work product doctrine because the Sisters are helping him prepare his cases against State Farm. But the attorney-client privilege and work product doctrine cannot be used as a shield to obfuscate Scruggs's misdeeds.

Notably, in a separate lawsuit brought against the Sisters by Renfroe, captioned *E.A. Renfroe & Co. v. Cori Rigsby Moran and Kerri Rigsby*, Civ. 06-AR-1752-S, ("*Renfroe* Litig."), a federal court in Alabama has already found the Sisters' actions reprehensible. There, the Honorable William M. Acker

2

Jr. found that "[t]here can be no doubt that Moran[1] and Rigsby violated important and critical terms of their contracts with Renfroe when they copied State Farm's records and turned them over to Scruggs." Mem. Opinion and Preliminary Injunction, dated Dec. 8, 2006 ("12/8/06 *Renfroe* Order," attached hereto as Exhibit 1) at 10 (footnote added). Judge Acker further found that the Rigsbys acted "upon advice of counsel [presumably Scruggs]" (*id.* at 8 (alterations in the original)), and that "it is apparent that they are all three now engaged in a cooperative effort," *id.* at 9. Scruggs and the Sisters now face contempt charges in the *Renfroe* case for failing to comply with Judge Acker's preliminary injunction, which required them "to deliver forthwith" to Renfroe's counsel all of the pilfered documents and to stop using them.

The Rigsbys' assertions of a putative "law enforcement privilege" and a privilege ostensibly derived from an unidentified federal statute are similarly baseless. A litigant claiming a privilege must provide the court and the opposing party with sufficient detail to determine whether each document or communication is potentially protected from disclosure. Here, the Rigsbys do not provide State Farm – or this Court – with even the most basic information required to evaluate whether a "law enforcement" privilege even potentially applies. And a litigant claiming a "statutory" privilege must, at an absolute minimum, identify the statute that is the putative source of the privilege.

Finally, but no less fundamentally, Kerri and Cori Rigsby's testimony makes clear that both Sisters failed to make even minimal efforts to comply with their obligations to produce relevant documents within their actual or constructive "possession, custody or control" as required by Rule 45 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 45(a)(1)(C).[2]

---

[1]    Cori Rigsby was formerly known by her married name, Cori Rigsby Moran. She is now divorced and goes by her maiden name. *See* Deposition of Cori Rigsby ("C. Rigsby Dep.") at 12:21-25. All pertinent portions of C. Rigsby Dep. are attached hereto as Exhibit 2.

[2]    Pursuant to Local Rule 37.1(B), State Farm submits contemporaneously herewith a separate statement quoting each of State Farm's requests for production and the Sisters' specific objections thereto.

Counsel for the Plaintiffs have repeatedly described the Rigsby Sisters as material witnesses whose testimony they intend to offer against State Farm.  The bases for any allegations the Rigsby Sisters might make are clearly relevant to this litigation.  Likewise, their activities in pilfering confidential information from State Farm, as well as their alliances with various plaintiffs' attorneys, bear significantly on their credibility.  The Rigsby Sisters' repeated interjection of inapplicable and meritless objections, and their refusal to answer State Farm's questions, improperly prevented State Farm from obtaining discovery regarding highly material facts in this litigation.  The Sisters further obstructed State Farm's ability to conduct a proper deposition by failing to bring a single document with them.  Accordingly, State Farm respectfully requests that this Court enter an order:  (i) overruling Cori and Kerri Rigsby's privilege objections in their entirety; (ii) compelling them to comply with State Farm's document requests; and (iii) ordering that State Farm shall be entitled to depose Cori and Kerri Rigsby for an additional four hours each.

## FACTUAL BACKGROUND

Cori and Kerri Rigsby began employment with Renfroe around 1998, working as independent claims representatives primarily on State Farm catastrophe assignments.  The Rigsby Sisters worked on catastrophe teams adjusting hail, wind, tornado, flood, and hurricane claims across the United States, including catastrophe claims in Florida, Oklahoma, Mississippi, and Texas.[3]

When "independents" like the Rigsby Sisters are assigned by Renfroe to work on State Farm catastrophe teams, they are issued laptop computers by State Farm which permit them access to confidential policyholder and company information.[4]  To protect the confidentiality of State Farm and State Farm policyholder information, both of the Rigsby Sisters have been consistently required by

---

[3]    *See* Deposition of Kerri Rigsby ("K. Rigsby Dep.") at 97:25-103:6, 242:2-7.  All pertinent portions of K. Rigsby Dep. are attached hereto as Exhibit 3.  *See also* C. Rigsby Dep. at 108:23-109:11, 124:16-18, 141:11-14.

[4]    K. Rigsby Dep. at 35:17-36:2, 325:16-25; C. Rigsby Dep. at 52:17-24.

Renfroe to sign a Code of Conduct, which specifically states in its various forms that Renfroe employees will be handling sensitive information and that they must treat all such information confidentially.[5] The Code of Conduct also specifically states that Renfroe employees are expected to protect the computers they are issued from misuse and from unauthorized access and disclosure of information.[6]

Renfroe employees also are required to sign an employment agreement which sets forth Renfroe's expectations of its employees.  Included among those expectations is a plainly stated requirement that employees will neither disclose nor misappropriate any confidential information of either Renfroe or its clients such as State Farm.[7] Among other things, the employment agreements signed by the Rigsby Sisters define "misappropriate" as disclosing or using confidential information for any purpose other than fulfilling the employee's responsibilities as an employee of Renfroe.

State Farm also requires all independents, including the Rigsby Sisters, to sign an Access Agreement whereby they agree to keep confidential all State Farm and State Farm policyholder information.  The Access Agreement further requires that such information not be used for the benefit of any third party.  In addition, the Rigsby Sisters and all other independents agree to access only data they have been authorized to access.[8]

Upon their agreement to the confidentiality and access restrictions, State Farm issues independent adjusters passwords for the various State Farm databases they will need to access.[9] For example, a password is required to access Outlook and Reflections in the State Farm system.[10]

---

[5]   *See* Code of Conduct dated 1999 (Exhibit 4) at 2; Code of Conduct dated 2004 (Exhibit 5) at 2.

[6]   *Id.*

[7]   *See* Employment Agreements at ¶ 6 (Exhibits 6 and 7).

[8]   *See* Access Agreements signed by the Rigsby Sisters, attached hereto as Exhibits 8, 9, 10, and 11.

[9]   *See* C. Rigsby Dep. at 144:3-147:21.

Reflections is also known as State Farm's Claim Service Record ("CSR") and is a part of its claims management system. Independent adjusters like the Rigsby Sisters are permitted routine access to the CSR as part of their duties as catastrophe team personnel. The CSR system has the ability to track access to individual claim files by every person – State Farm employee or independent contractor – who accesses a particular file.[11]

Both of the Rigsby Sisters served in the role of manager at the Gulfport Catastrophe Office, with Kerri serving in this role until December 2005 and Cori serving in this role until January 2006. As managers, the Rigsby Sisters did not have claim files assigned to them and, if at all, would have accessed claim files only occasionally to assist adjusters with problems.[12]

The Rigsby Sisters returned to Mississippi just a few days after Hurricane Katrina made landfall. They worked for Renfroe and were assigned to adjust claims on the Mississippi coast from early September 2005 through June 2006.[13] The Rigsby Sisters state that they began copying confidential State Farm information sometime between October 20, 2005 and October 31, 2005.[14]

The Rigsby Sisters claim that the copying started when Kerri became aware of two engineering reports regarding the claim file of Plaintiffs Thomas C. and Pamela McIntosh.[15] According to Kerri, one

_____

(cont'd from previous page)

[10] *Id.*

[11] *See* K. Rigsby Dep. at 325:9-326:7.

[12] *See* K. Rigsby Dep. at 103:7-105:10; C. Rigsby Dep. at 123:17-23.

[13] *See* Deposition of Cori Rigsby given in *Renfroe* ("C. Rigsby *Renfroe* Dep.") at 56; Deposition of Kerri Rigsby given in *Renfroe* ("K. Rigsby *Renfroe* Dep.") at 107-08. All pertinent portions of C. Rigsby *Renfroe* Dep. and K. Rigsby *Renfroe* Dep. are attached hereto as Exhibits 12 and 13 respectively.

[14] *See* K. Rigsby *Renfroe* Dep. at 45:3-7, 46:6-47:17; C. Rigsby *Renfroe* Dep. at 63:7-16.

[15] C. Rigsby *Renfroe* Dep. at 69; K. Rigsby *Renfroe* Dep. at 46.

report allegedly had a sticky note on it which stated "Do not pay; Do not discuss."[16] The copy they gave to ABC newsmagazine *20/20* actually states: "Do not *pay bill*. Do not discuss."[17] Kerri has testified that she copied the engineering reports, took them to her home, and showed them to her mother, Pat Lobrano ("Lobrano").[18] Lobrano was not at that time and has never been either a Renfroe employee or a State Farm employee.

Kerri supervised the adjustment of the McIntosh homeowners and flood insurance claims.[19] According to the claim files, she inspected the property, scoped the loss, and made findings as to the causation of damage. Kerri also authorized payment of the policy limits on the National Flood Insurance Program policy on the McIntosh property, and initiated State Farm's decision to pay $38,000 for wind damage under the homeowners policy in September 2005 prior to any request for an engineering report.

After December 2005, Kerri had no reason to access files not assigned to her, and after January 2006, Cori had no reason to access files not assigned to her, as both women were assigned to mediation responsibilities after those dates. Adjusters with mediation assignments have no reason to access files not assigned to them.

The Rigsby Sisters testified that they were introduced by their mother to Attorney Richard Scruggs in late February 2006.[20] In addition to being the mother of the Rigsby Sisters, Lobrano is a

---

[16]  K. Rigsby Dep. at 431:7-8; C. Rigsby Dep. at 217-18.

[17]  *See* Tr. of *20/20* (ABC television broadcast Aug. 25, 2006) at 4 (emphasis added), attached as Exhibit 14.

[18]  K. Rigsby Dep. at 403:21-404:1.

[19]  *Id.* at 220:23-25, 221:1-10.

[20]  C. Rigsby Dep. at 75:10-19; K. Rigsby Dep. at 301:18-302:2.

State Farm policyholder who had a pending claim for damage to her home in Ocean Springs.[21] According to the Rigsby Sisters, Scruggs and Lobrano were longtime friends, and Lobrano arranged for her daughters to meet Scruggs.[22]

At this first meeting, the Rigsby Sisters state that they provided Scruggs with copies of various State Farm documents, including the McIntosh engineering reports.[23] In the contempt hearing in the *Renfroe* matter, Scruggs testified that the documents provided to him at this meeting had "sticky notes" attached.[24] Kerri and Cori, however, have denied taking any original documents.[25]

Kerri has testified that, during the February meeting with Scruggs, she authorized Scruggs to use the documents to further his civil litigations against State Farm.[26] Cori has similarly testified that Scruggs had free rein to do whatever he wished with the documents.[27] Scruggs has testified that the documents were disseminated within the SKG and to other lawyers not affiliated with that group pursuing civil litigation against State Farm.[28]

During the period between February 2006 and June 5, 2006, Cori forwarded internal State Farm e-mails and documents from the State Farm laptop assigned to her to her home e-mail account

---

[21] C. Rigsby Dep. at 93:20-94:5; K. Rigsby Dep. at 358:4-13; *see also* C. Rigsby *Renfroe* Dep. at 18-19.

[22] K. Rigsby Dep. at 301:12-302:2.

[23] *See* K. Rigsby *Renfroe* Dep. at 64-66; C. Rigsby *Renfroe* Dep. at 112.

[24] *See* Transcript of Mar. 19, 2007 *Renfroe* Contempt Hearing ("*Renfroe* Hr'g Tr.") at 138:15-16, 139:7-13. All pertinent portions of the *Renfroe* Hr'g Tr. are attached hereto as Exhibit 15.

[25] C. Rigsby Dep. at 155:2-23; *see also* K. Rigsby *Renfroe* Dep. at 80; C. Rigsby *Renfroe* Dep. at 77.

[26] K. Rigsby *Renfroe* Dep. at 98-101.

[27] *Renfroe* Hr'g Tr. at 115:6-7.

[28] *Id.* at 158:9-11, 160:16-24.

(Moran2058@aol.com).[29]  During this same time period, Kerri forwarded internal State Farm e-mails from her State Farm laptop to her home e-mail account (Krigsby111@aol.com).[30]

The Rigsby Sisters testified that in April 2006, they retained Scruggs and a second unidentified lawyer to represent them on what they describe as a "related" matter regarding State Farm issues.[31] Around the same time, they state they met with both state and federal law enforcement authorities.[32]

On May 9, 2006, Scruggs filed the complaint in the case of *McFarland, et al. v. State Farm Fire & Casualty Co.*, Civil Action No. 1:06-cv-0466-LTS-RHW, in the Southern Division of the Southern District of Mississippi.  Some 476 plaintiffs, all of whom are State Farm policyholders, alleged bad faith denial of their claims by State Farm, including the improper use of engineering reports by State Farm.

During the weekend of June 3-5, 2006, the Rigsby Sisters, along with three other women (none of whom worked for Renfroe or State Farm), began what they have referred to as a "data dump."[33]  The Rigsby Sisters state they divided up claims listed on a State Farm engineering roster and printed log entries and payment information.[34]  Over the course of the weekend, the Rigsby Sisters printed out or copied a total of some 15,000 pages of State Farm documents and claim files, which they assembled into about nine or ten boxes.[35]

---

[29]  C. Rigsby Dep. at 45:21-46:12; K. Rigsby Dep. at 334:12-25.

[30]  K. Rigsby Dep. at 38:6-39:11, 409:9-15.

[31]  K. Rigsby *Renfroe* Dep. at 80-83; C. Rigsby *Renfroe* Dep. at 116-17, 130.

[32]  K. Rigsby Dep. at 302:3-7; C. Rigsby Dep. at 76:12-18.

[33]  K. Rigsby Dep. at 48:19-49:1, 308:14-309:16; C. Rigsby Dep. at 36:17-38:7.

[34]  C. Rigsby Dep. at 77:19-78-4; K. Rigsby Dep. at 332:23-334:5; *see also* K. Rigsby *Renfroe* Dep. at 88, 96; C. Rigsby *Renfroe* Dep. at 89.

[35]  C. Rigsby *Renfroe* Dep. at 90, 92.

After the "data dump" was completed, the Rigsby Sisters, on the advice of counsel, called the FBI and the Mississippi Attorney General's Office for those officials to pick up copies of the documents at Cori's home.[36] The Rigsby Sisters kept one copy of the documents, which they claim was later given to Scruggs for safekeeping to be used in the other matter they retained him for back in April 2006.[37]

On or about June 6, 2006, after the Rigsby Sisters completed the "data dump" and delivered the documents to law enforcement officials, they met with a State Farm manager, Dave Randel, and told him for the first time that they copied State Farm documents and provided them to law enforcement officials and Scruggs.[38] A number of media stories featuring the Rigsby Sisters and State Farm documents followed, including a nationally broadcast ABC *20/20* feature story.[39] At no time prior to their August 25, 2006 appearance on ABC's *20/20* did either of the Rigsby Sisters call Renfroe or advise the company that they had been funneling State Farm documents to Scruggs, the McIntoshes, the media, or to state and federal law enforcement authorities.[40]

---

[36] K. Rigsby *Renfroe* Dep. at 103; C. Rigsby *Renfroe* Dep. at 92.

[37] C. Rigsby *Renfroe* Dep. at 155. Notably, this is not the first time that attorneys in the SKG have engaged in improper conduct in obtaining documents from third parties. On August 30, 2006, this Court issued an order quashing subpoenas issued by another attorney in this group, finding that "[i]n this case, all on the same day, Plaintiffs' attorneys issued void subpoenas to compel production of documents Hemphill and Shelton had otherwise declined to produce, traveled to Texas, served the void subpoenas and gained possession of the documents, thereby depriving Defendant and Rimkus of any notice or opportunity to object thereto." *McFarland, et al. v. State Farm Fire & Cas. Co., et al.*, No. 1:06-cv-00466-LTS-RHW (S.D. Miss. Aug. 30, 2006) (Exhibit 16). To make matters worse, Plaintiffs' counsel took the position that they were counsel for these non-parties and that they could not share with State Farm counsel the documents produced pursuant to the improper subpoenas because they were purportedly subject to attorney-client privilege. Response in Opposition to Emergency Motion to Quash or for Protective Order, filed June 22, 2006 by Plaintiffs in *McFarland* ("the documents produced by Shelton and Hemphill are protected by the attorney/client privilege and are not proper for production at this time") (Exhibit 17).

[38] K. Rigsby *Renfroe* Dep. at 103-04; C. Rigsby *Renfroe* Dep. at 95.

[39] *See* Tr. of *20/20* at 8; *see also* Michael Kunzelman, *Sisters Blew Whistle on Katrina Claims*, Assoc. Press, Aug. 26, 2006 (Exhibit 18); Anita Lee, *Sisters copied State Farm files; Insurer underpaid on purpose, they believe*, Biloxi *Sun Herald*, Aug. 26, 2006 (Exhibit 19).

[40] K. Rigsby *Renfroe* Dep. at 110-11; C. Rigsby *Renfroe* Dep. at 138-40.

By July 1, 2006, Kerri and Cori Rigsby went to work for the Scruggs Law Firm as "litigation consultants."[41] They each receive $150,000 annually for their "consulting" services. Media reports about this consulting arrangement confirm they were hired to assist on the Scruggs Law Firm's insurance lawsuits and that the law firm has been using information provided by Kerri and Cori Rigsby for the cases they are pursuing.[42]

On September 25, 2006, the Scruggs firm filed a pleading in the *McFarland* case to which they attached portions of the activity log, which has not yet been produced but presumably came from the *McFarland* claim file.[43] On October 20, 2006, the Scruggs Law Firm filed this lawsuit on behalf of Pamela and Thomas McIntosh and attached as an exhibit a copy of the first engineering report and a copy of the "sticky note" Kerri states was attached.[44]

That the SKG is using the documents taken by the Rigsby Sisters to obtain an unfair advantage in this litigation is undeniable. Indeed, the Rigsbys themselves represented – presumably with input from their counsel and employer, the Scruggs Law Firm – that such documents "will be utilized in one or more currently pending cases in Mississippi (indeed, may be the focal point of one or more cases in Mississippi)."[45] Scruggs has confirmed this in press interviews. When asked whether the documents

---

[41]  10/2/06 Rigsby Answer at ¶ 21, Exhibit 20.

[42]  Michael Kunzelman, *Lawyer: Whistleblower helping build case against insurer in Hurricane Katrina lawsuit*, Assoc. Press, Mar. 17, 2006 (Exhibit 21); Anita Lee, *Grand juries looking at State Farm*, Biloxi *Sun Herald*, Sept. 28, 2006 (Exhibit 22).

[43]  *See* Exhibit 3 to *McFarland* Plaintiffs' Response in Opposition to State Farm Fire and Casualty Company's Emergency Mot. for a Protective Order, attached hereto as Exhibit 23.

[44]  *See* Compl. [Docket no. 1].

[45]  Defendants' Motion to Transfer, filed Oct. 2, 2006 in *Renfroe v. Moran*, at 3 (Exhibit 24). *See also* Opposition to Plaintiff's Expedited Motion for Limited Expedited Discovery, filed Oct. 2, 2006 in *Renfroe v. Moran*, at 2 ("In the Southern District of Mississippi, there are currently thousands of lawsuits pending against insurance companies involving breach of contract and/or fraud claims relating to hurricane damage. The documents that Defendants have turned over to their lawyers in Mississippi, to the FBI, and to the Mississippi Attorney General are squarely at issue in one or more of these lawsuits."), attached hereto as Exhibit 25.

purloined by the Rigsbys had an impact on cases he is handling, Mr. Scruggs replied, "[v]ery much so."[46]

### Renfroe's Lawsuit against Moran and Rigsby

As noted above, on September 1, 2006, Renfroe filed a complaint for breach of employment contract against Kerri and Cori Rigsby in the United States District Court for the Northern District of Alabama. *E.A. Renfroe & Co. v. Moran, et al.*, No. 2:06-cv-01752-WMA (N.D. Ala.). On December 8, 2006, Judge Acker found that Kerri and Cori Rigsby had violated their employment agreements and granted Renfroe's motion for a preliminary injunction, which required Scruggs and the Sisters "to deliver forthwith" to Renfroe's counsel all of the pilfered documents. His findings included the following:

> Without knowing the precise terms of the relationship between Scruggs and the two defendants, it is apparent that they are all three now engaged in a cooperative effort. Scruggs has filed one or more lawsuits against State Farm, claiming fraud against policyholders. The attachments to one of Scruggs's fraud complaints against State Farm look[] very much like items from a State Farm investigative file, like documents accessed and copied by Moran and Rigsby.
>
> *   *   *
>
> There can be no doubt that Moran and Rigsby violated important and critical terms of their contracts with Renfroe when they copied State Farm's records and turned them over to Scruggs. Nothing could be more plain than Renfroe's need to protect its clients' information. . . . [B]ecause the court finds no legal excuse for defendants' violating their employment agreements in the name of the public interest in helping with law enforcement, the court finds a very high degree of likelihood that Renfroe will succeed in obtaining a permanent injunction when the final judgment is entered.
>
> *   *   *
>
> [W]ithout an injunction Moran and Rigsby can continue to engage in the public criticism of Renfroe's most important client, and with impunity they can share State Farm's internal records with lawyers and other persons outside of the law enforcement community. Considering the clear and meaningful confidential relationship that exists

---

[46] *Hundreds of Katrina Victims Sue Insurance Companies*, NPR, Oct. 9, 2006, attached as Exhibit 26.

between Renfroe and its insurance clients, nothing could be more potentially harmful to Renfroe than a breach of the duty to keep its clients' confidential records confidential.[47]

Judge Acker issued the following preliminary injunction, conditioned on Renfroe's subsequent posting of bond:

> Cori Rigsby Moran and Kerri Rigsby, and their agents [and] . . . . attorneys . . . **(with the express exception of law enforcement officials)** are hereby MANDATORILY ENJOINED to deliver forthwith to counsel for plaintiff all documents, whether originals or copies, of each document and tangible thing, in any form or medium, that either of defendants or anyone acting in conjunction with or at the request or instruction of either of them, downloaded, copied, took or transferred from the premises, files, records, or systems of Renfroe or of any of its clients, including, but not limited to, State Farm Insurance Company and which refer or relate to any insurance claims involving damages caused or alleged to have been caused by Hurricane Katrina in the State of Mississippi.

> Defendants and their agents . . . are further ENJOINED not to further disclose, use or misappropriate any material described in the preceding paragraph unless to law enforcement officials at their request.[48]

Attorney General Hood was permitted to intervene in *Renfroe* for the purpose of seeking a stay of the litigation, a request that was denied.[49] But in response to arguments that the injunction would interfere with Attorney General Hood's criminal investigation, Renfroe suggested that the order could also provide that Renfroe's counsel not share the documents with anyone (including Renfroe or State Farm) absent express authorization of the court.[50] The court's order reflects this compromise.

Scruggs admits that on the day the injunction was issued, he did not send his copies of the documents to Renfroe's attorneys as ordered by the injunction.[51] Rather, he sent a copy of his

---

[47] 12/8/06 *Renfroe* Order at 9-11.

[48] 12/8/06 *Renfroe* Order at 13-14.

[49] Order filed Nov. 20, 2006 in *Renfroe*, attached as Exhibit 27.

[50] *Renfroe* Order at 13-15.

[51] *See Renfroe* Hr'g Tr. at 74:4-76:23.

documents to the Attorney General in order to keep a copy away from the court.[52]  And although he had provided copy sets of the documents to other lawyers, he made no effort to retrieve those documents as required by the injunction.[53]  Renfroe has filed a motion to hold the Rigsbys, Scruggs, and the Scruggs Law Firm in contempt of court for failure to comply with the injunction, which is under submission.[54]

The Rigsby Sisters have represented that they turned over all of their copies of the documents to the Scruggs Law Firm prior to entry of the injunction.[55]  However, testimony adduced at the contempt hearings suggests there are numerous sets of documents that are unaccounted for.  Moreover, the Sisters have given widely conflicting accounts of how many documents they copied, and appear to be engaged in an obfuscation campaign.  The Sisters' testimony in this case indicates that they have not taken reasonable steps to locate such documents.  *See infra* section V.  In fact, their attorney acknowledges that additional pilfered documents might still "show up."  *See* K. Rigsby Dep. at 58:18-59:16 (Statement by Mr. Hawley:  "Neither Kerri nor Cori currently possess [sic] any, as they have stated before in the other case.  *But to the extent those documents show up*, we would object based on the injunction." (emphasis added)).

## ARGUMENTS AND AUTHORITIES

At their respective depositions, Kerri and Cori Rigsby were regularly instructed not to answer State Farm's questions based on assertions of the attorney-client and work product privileges, a putative "law enforcement privilege," and a privilege ostensibly derived from an unidentified federal statute.

---

[52]  *Id.* at 76:24-77:2.

[53]  *Id.* at 158:9-161:3, 163:9-164:7, 160:16-24.

[54]  *See* Renfroe's Motion for Contempt of Court, filed Jan. 5, 2007 in *Renfroe*, attached as Exhibit 28.

[55]  Exhibits 29 (Dec. 21, 2006 letter from Rigsby/Moran counsel to Renfroe counsel), 30 (Jan. 3, 2007 letter from Rigsby/Moran counsel to Renfroe counsel), and 31 (Jan. 5, 2007 Affidavit of Barbara Ellis Stanley, counsel for Renfroe, to Renfroe's Motion for Contempt of Court, filed Jan. 5, 2007 in *Renfroe v. Moran*), attached.

And – although neither Sister provided a privilege log – both refused to comply with State Farm's document requests based on boilerplate assertions of "burdensomeness" and vague assertions of attorney-client and work product privileges. All of these objections are meritless; all should be overruled.[56]

The Rigsbys, as the parties claiming the privilege, have the burden of establishing all of the essential elements to support the claim. *See In re Grand Jury Proceedings*, 517 F.2d 666, 670 (5th Cir. 1975) (attorney-client); *Scott v. Litton Avondale Indus.*, No. Civ.A. 01-3334, 2003 WL 1913976, at *3 (E.D. La. Apr. 17, 2003) (work product). "That burden cannot be met by [an attorney's] 'mere conclusory or *ipse dixit* assertions.'" *OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, No. 04 Civ. 2271, 2006 WL 3771010, at *4 (S.D.N.Y. Dec. 15, 2003) (citations and internal quotation marks omitted).

As set forth below, the record in this case demonstrates that Kerri and Cori Rigsby have not and cannot meet their burden. Accordingly, their objections should be overruled and the Court should permit State Farm to reconvene the depositions of Kerri and Cori Rigsby.

**I.      The Rigsby Sisters Interposed Unwarranted Objections of the Attorney-Client and Work Product Privileges in Numerous Instances Where These Privileges Are Facially Inapposite**

The Rigsbys' attorneys interposed multiple objections asserting the attorney-client and/or work product privilege to numerous questions regarding the Sisters' contentions about crucial factual elements of the McIntoshes' claims against State Farm. But it is well-settled that neither privilege can be invoked to shield the discovery of relevant facts.

---

[56]   The Sisters' counsel have acknowledged that they are required to provide State Farm with a privilege log, and promised that they would do so. *See* K. Rigsby Dep. at 28:20-25. However, no such privilege log has been provided to date.

The attorney-client privilege only protects "confidential *communications* made for the purpose of facilitating the rendition of professional legal services to the client." Miss. R. Evid. 502(b).[57] The underlying facts of an action are *not* protected by the attorney-client privilege. *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) (protection of privilege extends only to communications, not facts). Likewise, the factual circumstances surrounding the attorney-client relationship itself are not only discoverable, they are crucial facts required to assess whether a communication is privileged in the first place. *See In re Grand Jury Proceedings*, 517 F.2d at 670.

The work product doctrine applies only to *documents and tangible things* prepared in anticipation of litigation or for trial. Fed. R. Civ. P. 26(b)(3). "However, because the doctrine is intended only to guard against divulging an attorney's strategies and legal impression," it – like the attorney-client privilege – "*does not protect facts concerning the creation of work product, or facts contained within work product.*" 6 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 26.70[2][a] (3d ed. 2007) (emphasis added). "Likewise, facts are not protected from disclosure by virtue of having been gathered by an attorney." *Id.*

Here, the Sisters' attorneys interposed multiple objections, ostensibly based on the work product doctrine, to questions which did not even arguably require the disclosure of a confidential "document or tangible thing." For instance, at Cori Rigsby's deposition, she was questioned about her use of her State Farm-issued laptop computer. As noted above, State Farm provides laptops to "independents" like the Rigsby Sisters when they are assigned to work on State Farm catastrophe teams. At all times, these

---

[57] In diversity cases such as this, the attorney-client privilege is determined based on the laws of the state that supplies the substantive law, in this case, Mississippi. *See* Fed. R. Evid. 501. Mississippi's attorney-client privilege is codified by Mississippi Rule of Evidence 502(b). Mississippi courts construe Miss. R. Evid. 502(b) in accordance with the federal common law of the attorney-client privilege. *See, e.g.*, *Jackson Med. Ctr. for Women, P.A. v. Moore*, 836 So. 2d 767 (Miss. 2003) (construing federal law to hold that party waived attorney-client privilege by testifying about confidential communication). The work product doctrine is governed by a uniform federal standard, even in diversity cases. *See Conoco Inc. v. Boh Bros. Constr. Co.*, 191 F.R.D. 107, 118 n.6 (W.D. La. 1998).

laptops remain State Farm's property. To protect the confidentiality of State Farm and State Farm policyholder information, the Rigsby Sisters were required to sign a Code of Conduct, in which they agreed to protect their State Farm computers from misuse and from unauthorized access and disclosure of information.[58] There can be no serious dispute that State Farm is entitled to discover *facts* regarding whether the Rigsby Sisters' use of their State Farm laptops was consistent with their agreements. Yet the record plainly demonstrates that when State Farm's counsel attempted to do just that, their attorneys interposed a barrage of unfounded privilege objections and improperly instructed the witnesses not to answer.

> MR. WEBB: Okay. Did you ever let any lawyers have access to your laptop with State Farm?
>
> THE WITNESS: Lawyers with State Farm?
>
> MR. WEBB: Any lawyers.
>
> THE WITNESS: I might have.
>
> MR. WEBB: Who?

C. Rigsby Dep. at 148:9-14. Rather than answer this straightforward question, Cori Rigsby signaled to her lawyers that she was uncomfortable with the subject matter. Taking their cue, her lawyers promptly interjected frivolous privilege objections to stifle the questioning:

> THE WITNESS: **Do I do that?**
>
> MR. HAWLEY: **We probably ought to go off the record and talk.**
>
> (off the record).
>
> MR. ZACH SCRUGGS: Okay. Sorry. Dan, in response to the last question before we broke, **I'm going to instruct the witness not to answer on the grounds of attorney-client privilege, work-product doctrine,** and to the extent it implicates ongoing federal investigation.
>
> * * *
>
> MR. WEBB: What lawyers did you let have access to your State Farm laptop?

---

[58] *See* Code of Conduct dated 1999; Code of Conduct dated 2004.

> MR. HAWLEY:  Same series of objections.
>
> MR. ZACH SCRUGGS:  Let me object on the grounds of attorney-client privilege, work-product doctrine, extent it would violate a court order and implicate ongoing governmental investigations.  **Don't answer the question.**
>
> * * *
>
> MR. WEBB:  Did you – did Kerri provide her laptop to any lawyer?
>
> MR. ZACH SCRUGGS:  Same objection.
>
> MR. HAWLEY:  Same objection.  Same instruction.
>
> MR. ZACH SCRUGGS:  **Same instruction not to answer.**
>
> MR. WEBB:  Did Kerri provide her laptop to anyone with the Scruggs Katrina Group?
>
> MR. ZACH SCRUGGS:  **Same objection and instruction not to answer.**
>
> MR. HAWLEY:  **I join in that.**
>
> MR. WEBB:  When did these lawyers have access to your laptop and Kerri's laptop?
>
> MR. ZACH SCRUGGS:  **Same objection and instruction not to answer.**
>
> MR. HAWLEY:  **I join in that.**

C. Rigsby Dep. at 148:15-152:13 (emphasis added).  These objections are clearly improper and should be overruled.

Similarly, Kerri Rigsby testified that at the time she handled the McIntoshes' claim, she concluded their property was damaged mainly by flood.  She testified that this conclusion was based in large part on a report prepared by Haag Engineering.  *See* K. Rigsby Dep. at 265:20-266:11.  Kerri Rigsby further testified that she changed her opinion of the Haag report based on an analysis done by her "[c]olleagues."  *Id.* at 266:16-17.  When State Farm's counsel attempted to question Kerri Rigsby on this crucial fact, Scruggs instructed her not to answer:

> MR. ZACH SCRUGGS:  All right.  Dan, I'm going to have to object on this.  **You're getting into work product now, so I'm going to object and instruct her not to answer.**

*Id.* at 266:22-25.  This objection is unfounded and should be overruled.  Clearly, State Farm is entitled to know what, if anything, Kerri Rigsby contends is inaccurate about the Haag report, when she changed

18

her mind, and what facts support her contentions.  *See In re Savitt/Adler Litig.*, 176 F.R.D. 44, 48 (N.D.N.Y. 1997) (overruling plaintiffs' "work-product" objection to interrogatories which requested facts supporting plaintiffs' contentions, because work product protection does not extend to facts).  Kerri similarly asserted the work product privilege and refused to identify documents that she contends support her claims of wrongdoing by State Farm.  K. Rigsby Dep. at 61:19-62:24.  This objection should be overruled as well.

The Sisters also misused the attorney-client privilege by asserting it to shut down questioning regarding relevant *facts* that are within their knowledge.  For instance, Cori Rigsby was instructed by Zach Scruggs not to answer the following question:

> MR. WEBB:  Okay.  Can you tell me why you and Kerri went to representatives of the Scruggs Katrina Group regarding the McIntosh documents rather than going to law enforcement?
>
> * * *
>
> MR. ZACH SCRUGGS:  I think that's too close to – I think that's coming up on attorney-client privilege and work-product protection, so I'm going to instruct her not to answer that.

C. Rigsby Dep. at 187:8-188:13.  Clearly, Cori Rigsby can answer this straightforward question without revealing any privileged communication; she should be compelled to do so.

## II. The Rigsby Sisters Are Not Entitled to Claim Work Product or Attorney-Client Privilege Because Their Conduct and That of Their Counsel Undermines the Adversary Process and Violates the Ethical Rules and Canons

### A. A Lawyer Who Strategically Hires a Material Witness as a "Trial Consultant" and Illicitly Obtains an Adverse Party's Documents Cannot Claim Privilege as a Matter Of Law

Attorney Scruggs is improperly attempting to build a wall of secrecy around every aspect of the "consulting" arrangement between the SKG and the Rigsby Sisters by improperly evoking the work product doctrine.  According to Scruggs, the work product doctrine prevents discovery of, and examination about, any document the Rigsby Sisters may have seen while "consulting" for the SKG:

> MR. RICHARD SCRUGGS: . . . She's working for us in preparing cases, and unless you want me to start subpoenaing people that work for you in preparing your cases and taking your depositions about documents and work that they've done, I think we're going to have to object to that.

K. Rigsby Dep. at 30:11-17.

Scruggs similarly asserts that Kerri Rigsby is shielded from questions regarding any documents she contends support a claim of wrongdoing by State Farm. In response to questioning about the existence of such documents, Scruggs stated:

> MR. RICHARD SCRUGGS: I think – I don't have to make that explanation to you, Mr. Webb. She is working for the Scruggs Katrina Group in the McIntosh and many other case matters. She is our employee and is helping us prepare the McIntosh case. And to the extent that those documents exist, I'm not going to allow her to answer that based on that objection.

K. Rigsby Dep. at 65:1-8. Similar objections were interposed at Cori Rigsby's deposition. *See* C. Rigsby Dep. at 31:22-25.

Scruggs's omnibus objections should be overruled. Nobody disputes that under normal circumstances, a law firm's personnel are not required to disclose what documents they might have reviewed in preparing a case. But the Sisters are manifestly *not* typical law firm employees or consultants; they are first and foremost material fact witnesses in the case. And not just any material witnesses; the Sisters' own testimony establishes that they: (i) worked for Renfroe on State Farm matters, including Kerri's supervision of the McIntosh claim; (ii) had extensive access to State Farm's confidential and proprietary material concerning thousands of Katrina claims; (iii) with Scruggs's active encouragement and support, stole confidential State Farm material and passed it along to Scruggs and other attorneys at the SKG; and (iv) are now working for the SKG and each receive a hefty $150,000 per year in "consulting" fees, as well as other financial incentives that they refuse to even discuss.[59]

---

[59] For instance, Kerri Rigsby admits that she is to be represented by another attorney associated with the SKG in another action against State Farm on a contingency basis that would potentially net her a sum of money.

*(cont'd)*

Not surprisingly, federal courts have repeatedly recognized that the work product doctrine does not protect lawyers who strategically hire material witnesses as "trial consultants." For instance, in *State of New York v. Solvent Chemical Co.*, 166 F.R.D. 284 (W.D.N.Y. 1996), a defendant in an environmental lawsuit, ICC, hired as a litigation consultant a Mr. Beu, who was a former employee and potentially adverse material fact witness in the case. When Beu was deposed by opposing counsel, ICC's lawyers instructed him not to answer questions concerning various aspects of his work under the consulting agreement, because the lawyers claimed the information was shielded by the work product doctrine. 166 F.R.D. at 287. ICC's lawyers also instructed Beu not to produce the consulting agreement or discuss "whether he had looked at or been shown any documents" relating to the litigation. *Id.* The court found that the work product doctrine was inapplicable:

> The court has no difficulty in finding that the consulting agreement, and any related documents that may reveal the facts and circumstances surrounding Mr. Beu's retention as a litigation consultant by ICC, as well as the terms and conditions of his retention, are not protected from disclosure under the work product rule. The rule is intended to protect the privacy of litigants and their representatives *only insofar as their conduct does not erode the integrity of the adversary process. Here, the conduct of ICC, Solvent, and their counsel in relation to Mr. Beu has threatened to undermine the integrity of the adversary process in this case.*

*Id.* at 289 (citations omitted) (emphasis added).

The *Solvent Chemical* court further ruled that any work product protection that might have attached to documents Beu reviewed and prepared under the consulting agreement was "vitiated by ICC's purchasing of Mr. Beu's cooperation as a fact witness in this case." *Solvent Chem.*, 166 F.R.D. at 292; *accord Parrott v. Wilson*, 707 F.2d 1262, 1271 (11th Cir. 1983) ("[T]he purpose of the work product privilege is to protect the integrity of the adversary process; *therefore, it would be improper to allow an attorney to exploit the privilege for ends that are antithetical to that process.*") (emphasis

---

*(cont'd from previous page)*
Obviously, this fact goes to witness bias and is clearly discoverable. Notwithstanding, Kerri's attorneys instructed her not to answer any of State Farm's questions about this agreement. K. Rigsby Dep. at 341:8-342:16.

added); *Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981) ("The work product privilege creates a zone of privacy within which a lawyer can prepare his case free of adversarial scrutiny. From its inception, however, the courts have stressed that the privilege is 'not to protect any interest of the attorney, who is no more entitled to privacy or protection than any other person, but to protect the adversary trial process itself.'") (citation omitted); *see also Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989) (explaining purpose of work product privilege is "to promote the adversary system").

Courts have similarly recognized that attorneys – like Scruggs – who make strategic use of a company's employees to gather documents and information to use against the company in a lawsuit "threaten judicial integrity and the adversary processes." *In re Shell Oil Refinery*, 143 F.R.D. 105, 108 (E.D. La. 1992). Privilege objections cannot be used as a shield to conceal such improper behavior. For instance, in *Arnold v. Cargill Inc.*, No. 01-2086, 2004 WL 2203410 (D. Minn. Sept. 24, 2004), the plaintiffs' attorney obtained numerous confidential and privileged documents from a former employee of the defendant corporation, Cargill. The court ordered the former employee "to appear for two days of deposition and to answer all of Cargill's inquiries regarding his interaction with [plaintiffs' attorney] regardless of any claim of attorney-client privilege [by counsel]." *Id.* at *4. The court ultimately found the attorney's conduct so abhorrent that it granted Cargill's motion to disqualify him as plaintiffs' counsel. *Id.* at *14.

Here, Scruggs's highly improper actions impact numerous cases the SKG is handling. Thus, this case presents an even more egregious affront to the adversary process than *Solvent Chemical* and *Arnold*. Accordingly, this Court should, at a minimum, declare that the materials collected by Scruggs and the Sisters as a result of their illicit scheme are not subject to any privilege. *See also Pfeifer v. State Farm Ins. Co.*, No. Civ. A. 96-1895, 1997 WL 276085, at *3 (E.D. La. May 22, 1997) (holding that "the principle of fairness governing the application of the work product doctrine" mandated that tape recordings surreptitiously made by an employee while at the company be turned over to the defendant).

22

**B.    The Unethical Conduct of Scruggs and the SKG Vitiates Any Putative Privilege**

The Fifth Circuit held that an attorney "implicitly waives the protection of the work product doctrine" by engaging in conduct that "violates the American Bar Association's Model Rules of Professional Conduct." *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 686 (5th Cir. 1989); *see also Gotch v. Ensco Offshore Co.*, 168 F.R.D. 567, 572 (W.D. La. 1996) (concluding that a "legal and ethical violation of counsel . . . vitiates the work product privilege"). Similarly, communication between a lawyer and his client that violates the ethical rules and canons is fundamentally inconsistent with the principles behind the attorney-client privilege, namely, "observance of the law" and the "administration of justice." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985). Therefore, no attorney-client privilege attaches to communications that violate the ethical rules. *See, e.g., Arnold*, 2004 WL 2203410, at *5.[60]

It is beyond debate that Scruggs's relationship with the Rigsby Sisters and his receipt of approximately 15,000 stolen pages of State Farm's proprietary documents violates the letter and spirit of numerous ethical rules and canons. For example, in *EEOC v. Hora, Inc.*, C.A. No. 03-cv-1429, 2005 U.S. Dist. LEXIS 11279 (E.D. Pa. June 9, 2005), counsel Barnett represented a former employee in an employment discrimination lawsuit against a hotel operator. Prior to filing suit, Ms. Barnett began communicating with a current hotel employee, who subsequently provided her with numerous documents and confidential information pertinent to the lawsuit. The court found that "Ms. Barnett's pre-litigation tactics far over-stepped ethical boundaries and principles." *Id.* at 2. The court explained:

> Ms. Barnett either sought or received information from Ms. Richardson [defendants' employee] that Ms. Barnett, as an attorney practicing in the field of employment law,

---

[60] The Mississippi Rules of Professional Conduct are identical to the American Bar Association's Model Rules of Professional Conduct. *United States v. Stames*, 157 F. App'x 687, 2005 U.S. App. LEXIS 26890, at *16 (5th Cir. Dec. 7, 2005), *cert. denied*, No. 06-9805, 2007 U.S. LEXIS 3878 (U.S. Apr. 2, 2007). The United States District Court for the Southern District of Mississippi has adopted the Mississippi Rules of Professional Conduct. *See* Joint Mississippi Local Rule 83.5 (2004).

> knew or should have known was the [defendants'] confidential business and personnel information. As an attorney familiar with employment litigation, Ms. Barnett knew or should have known that some of that information was directly related to the [defendants'] defense of [plaintiff's] complaint. Furthermore, Ms. Barnett knew or should have known at the time of these communications that Ms. Richardson was a secretly, but vehemently, disgruntled Hotel employee who occupied a position of intimate business trust at the high level of Hotel management.

*Id.* at \*8. The court concluded Ms. Barnett's "unabashed and unreserved . . . exploitation of Ms. Richardson's position and of Ms. Richardson's obvious personal agenda," *id.* at \*10, violated several ethical rules, including Pennsylvania Rule 4.2 (prohibiting a lawyer from communicating with represented parties), *id.* at \*34-35, and Rule 4.4 (prohibiting a lawyer from using "'methods of obtaining evidence that violate the legal rights of [a third person]'"), *id.* at \*42 (quoting the Rule).[61]

Likewise, in *Rentclub, Inc. v. Transamerica Rental Finance Corp.*, 811 F. Supp. 651 (M.D. Fla. 1992), *aff'd*, 43 F.3d 1439 (11th Cir. 1995), opposing counsel hired as a paid "trial consultant" a former highly placed employee, Mr. Canales, of defendant Transamerica Rental Finance Corp. ("TRFC"). The *Rentclub* court found that this "consulting arrangement" violated several ethical rules and created a strong appearance of impropriety:

> The appearance of professional impropriety resulting from the attorney-"trial consultant" relationship in this case takes two general forms. First, there is the appearance that [opposing counsel] Trenam, Simmons, through its payments to Canales, has induced Canales to disclose to it confidential matters relating to TRFC's managerial practices and relating to TRFC's strategies, theories and mental impressions in this and/or substantially related litigation. *An irrefutable presumption of such inducement flows from the fact that Canales, who was privy to confidential and proprietary information belonging to TRFC, is now on retainer for Trenam, Simmons.* Such inducement violates: (a) Fla. Bar Code of Prof. Cond., 4-1.6, which requires attorneys to maintain confidentiality and imposes upon attorneys a correlative duty to refrain from inducing others to disclose confidential matters; (b) Fla. Bar Code of Prof. Cond., 4-4.2, which prohibits attorneys from directly communicating with adverse parties, including employees or former employees of the corporate parties represented by counsel; and (c)

---

[61] In *Hora*, the court was construing Pennsylvania's Rules of Professional Conduct. Mississippi's Rules of Professional Conduct 4.2 and 4.4 contain materially identical prohibitions on communicating with represented parties or their agents and wrongfully obtaining evidence from third parties.

Fla. Bar Code of Prof. Cond., 4-8.4(d), which prohibits attorneys from engaging in conduct that is prejudicial to the administration of justice.

        Second, there is the appearance that Canales is being paid for his factual testimony as opposed to his work as a "trial consultant." Such conduct violates: (a) Fla. Bar Code of Prof. Cond., 4-8.4(c), which prohibits attorneys from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation; and (b) Fla. Bar Code of Prof. Cond., 4-8.4(d), which prohibits attorneys from engaging in conduct that is prejudicial to the administration of justice.

*Rentclub*, 811 F. Supp. at 654 (emphasis added).[62]

Similarly, in *Esser v. A.H. Robins Co.*, 537 F. Supp. 197 (D. Minn. 1982), the court disqualified the plaintiff's law firm for violating Minnesota Canon 9 (which admonishes attorneys to avoid even the appearance of impropriety) by hiring defendant's former senior claims adjuster. *Id.* at 200, 203. The court stated that permitting the attorney to "profit financially in view of his violations of the ethical code of the profession would be to make a mockery of the ethical standards that have been violated and further impair the integrity of and the public confidence in the legal system." *Id.* at 203; *see also In re Complaint of PMD Enter. Inc.*, 215 F. Supp. 2d 519, 530 (D.N.J. 2002) (disqualifying attorney who hired former employee to review company's documents); *United States v. SAE Civil Constr., Inc.*, No. 4:CV95-3058, 1996 WL 148521, at *5 (D. Neb. Jan. 29, 1996) (disqualifying attorneys who retained opposing party's former president as a trial consultant); *MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*, 764 F. Supp. 712, 727-28 (D. Conn. 1991) (disqualifying attorneys based upon retention of the former office manager of the opposing party as a trial consultant); *Am. Prot. Ins. Co. v. MGM Grand Hotel-Las Vegas, Inc.*, No. CV-LV-82-26, 1986 WL 57464, at *1-2 (D. Nev. Mar. 11, 1986) (disqualifying counsel because he attempted to hire as a trial consultant a former officer and current expert of an opposing party, who had had access to the company's confidential information).

---

[62] Florida's Rules correspond with the Mississippi Rules of Professional Conduct 1.6, 4.2, and 8.4(c) & (d).

Clearly, the highly unscrupulous conduct of Scruggs and, by extension, the entire SKG –
communicating over several months with the Rigsby Sisters and receiving approximately 15,000 stolen
pages of State Farm's proprietary documents – is a clear violation of the ethical rules and canons, which,
at a minimum, vitiates any claimed privilege.[63]

### C.    The Rigsby Sisters' Retention of Scruggs Falls within the Crime-Fraud Exception To the Attorney-Client and Work Product Privileges

The Sisters admit that, from their very first meeting with Scruggs, they have been improperly
funneling him copies of various confidential company documents so the documents could be used in this
and other lawsuits against State Farm.[64] These meetings went on for months, during which time the
Sisters continued to purloin confidential documents and information for use by Scruggs and the SKG.
*See, e.g.*, K. Rigsby Dep. at 37-39 (describing how she would use her State Farm-issued computers to e-
mail confidential claim files to her personal e-mail account and then forward them to Scruggs and other
members of the SKG); *see also* 12/8/06 *Renfroe* Order at 9 ("Without knowing the precise terms of the
relationship between Scruggs and the two defendants, it is apparent that they are all three now engaged
in a cooperative effort.").

Such untoward conduct falls squarely within the crime-fraud exception to the attorney-client and
work product privileges.  Under the crime-fraud exception, otherwise privileged communications or
work product made for, or in furtherance of, the purpose of committing a crime or fraud will not be
privileged or protected.  *See In re Grand Jury Subpoena*, 419 F.3d 329, 338-39 (5th Cir. 2005).
"[A]lthough referred to as an 'exception' to the attorney-client privilege and work product doctrine, the
crime/fraud exception is not truly an exception.  Rather, it is an exclusion of certain activity from the

---

[63]    State Farm reserves the right to seek additional remedies based on Scruggs's multiple ethical violations,
including disqualification from this and other cases handled by the SKG, sanctions, damages, and equitable relief.

[64]    *See* K. Rigsby *Renfroe* Dep. at 64-66; C. Rigsby *Renfroe* Dep. at 112.

protective reach of the privileges." *Rambus, Inc. v. Infineon Techs. A.G.*, 222 F.R.D. 280, 287 (E.D. Va. 2004) (footnote omitted). Indeed, a basic element the proponent must prove to establish the applicability of the attorney-client privilege is that the communication was *not* made "for the purpose of committing a crime or tort." *In re Grand Jury Proceedings*, 517 F.2d at 670.

Moreover, "[t]he term 'crime/fraud exception' . . . is 'a bit of a misnomer,' as many courts have applied the exception to situations falling well outside of the definitions of crime or fraud." *Rambus*, 222 F.R.D. at 287 (citations omitted); *see also Parrott*, 707 F.2d at 1271 (stating that crime-fraud exception applies to work product created as a result of lawyers' "unprofessional conduct"). This case falls squarely within the crime-fraud exception.

A party seeking to pierce the work product or attorney-client privilege must make a *prima facie* showing "that the client intended to further an ongoing crime or fraud during the attorney-client representation." *Grand Jury Subpoena*, 419 F.3d at 346. For the reasons outlined above, this showing is easily made: Scruggs clearly engaged in "unprofessional conduct," and the Rigsby Sisters have no right to claim privilege to consult an attorney for assistance with pilfering State Farm's confidential documents. *See supra* §§ II(A) & (B).

Once a *prima facie* showing is made, the privilege is vitiated for all communications or documents that "'reasonably relate to the fraudulent activity.'" *Grand Jury Subpoena*, 419 F.3d at 346 (citation omitted). In cases such as this where "the client's entire representation [was] in furtherance of the alleged crime or fraud," the Sisters' entire file is discoverable. *Id.* at 344 n.12.

## III. State Farm Is Entitled to All Documents, Reports, and Data Compilations upon Which the Sisters Base Their Opinion

As noted above, Kerri Rigsby was instructed not to answer any questions regarding an analysis of the Haag report she claims was done by her SKG "[c]olleagues." *See* K. Rigsby Dep. at 266:16-17. Even if such analysis were privileged, State Farm would be entitled to it – along with all reports, data

27

compilations, and other documents Kerri has reviewed. Scruggs has testified that he hired Kerri Rigsby as a "consultant" because she is a veteran claims adjuster. *See Renfroe* Hr'g Tr. at 143:1, 148:10-149:5. And he presumably intends to proffer Kerri Rigsby's testimony as both a material fact witness and a veteran claims adjuster. Thus, for the purpose of discovery, Kerri should be treated as a potential expert witness.

As numerous courts have recognized, "fundamental fairness requires disclosure of all information supplied to a testifying expert in connection with his testimony." *In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d 1370, 1375 (Fed. Cir. 2001). This is so "even if those communications contain the attorneys' mental impressions or trial strategy or [are] otherwise protected by the work product privilege." *TV-3, Inc. v. Royal Ins. Co. of Am.*, 193 F.R.D. 490, 491 (S.D. Miss. 2000); *accord Pinal Creek Group v. Newmont Mining Corp.*, No. CV-91-1764-PHX-DAE, 2006 WL 1817000 (D. Ariz. June 30, 2006).

Here, Kerri Rigsby readily admits that she reviewed documents she believes support her claim of wrongdoing by State Farm:

> MR. WEBB: Well, just so I'm clear about – clear about this, there are documents, specific documents that you claim that you have looked at other than the documents in the Renfroe case that you believe support some claim of wrongdoing by State Farm?
>
> THE WITNESS: Yes.

K. Rigsby Dep. at 63:1-7. Accordingly, she must produce all such documents, reports, analyses, and data compilations she has reviewed (and, to the extent Cori Rigsby will be proffered as a witness in this case, documents, reports, analyses, and data compilations Cori has reviewed as well). Alternatively, the Court should enter an order limiting or excluding the Rigsby Sisters' testimony in this case.

**IV.    The Rigsby Sisters' Vague Allusions to a "Law Enforcement" or "Statutory" Privilege Are Not Supported by Facts in the Record**

In addition to their numerous unfounded assertions of the attorney-client and work product privileges, the Rigsbys also refused to answer numerous questions posed by State Farm based on a putative "law enforcement privilege" and a privilege ostensibly derived from an unidentified federal statute.[65] These vague assertions of a "law enforcement privilege" or "statutory privilege" do not satisfy their burden of proving their entitlement to a privilege. *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 570-71 (5th Cir. 2006) (discussing ten-factor test the government needed to prove to be entitled to assert a law enforcement privilege). Here, the Rigsbys' attorneys simply made blanket pronouncements that "both Cori and Kerri have been cooperating witnesses with the federal government and the state government of Mississippi, and they've both been instructed not to divulge the nature, scope, or content of conversations with the investigating authorities." C. Rigsby Dep. at 79:24-80:7; K. Rigsby Dep. at 298:22-299:21. However, their attorneys' "'mere conclusory or *ipse dixit* assertions'" are insufficient to establish a privilege. *OneBeacon Ins. Co.*, 2006 WL 3771010, at *4 (citations and internal quotation marks omitted).

A litigant claiming a privilege must provide the court and opposing party with sufficient detail to determine whether each document or communication is potentially protected from disclosure. *See* MOORE'S FEDERAL PRACTICE, *supra* at 18, § 26.90[2]. The record in this case clearly demonstrates that the Rigsbys' repeated assertions of "law enforcement privilege" do not provide State Farm – or this Court – with even the most basic information necessary to evaluate whether a "law enforcement" or "statutory" privilege even potentially applies. For example:

- Kerri was instructed not to answer whether she was aware of any informal agreement granting her immunity in criminal or civil lawsuits; her attorney claimed "she's not at liberty

---

[65]    The Rigsbys' written objections to State Farm's subpoenas do not explicitly claim a "law enforcement privilege."

to address the extent of her involvement as a cooperating witness or as any sort of witness." (K. Rigsby Dep. at 298:22-299:21.) Cori was instructed not to answer whether she had been granted "any kind of immunity" from civil or criminal actions. (C. Rigsby Dep. at 79:24-80:7.)

- Kerri was also instructed not to identify the members of the Mississippi Attorney General's Office and the United States Attorney's Office with whom she had spoken on the grounds that doing so would reveal "who they've got on the case and what their level – their area of expertise is. . . . And the nature of the case." (K. Rigsby Dep. at 303:15-304:10; *see also id.* at 306:22-307:1.) Scruggs also claimed to base his instructions on the existence of "[a]n ongoing grand jury criminal investigation" but failed to explain how answering the question would impact the investigation. (*Id.* at 305:1-3.)

- Cori's attorneys instructed her not to testify about whether she or Kerri provided their State Farm laptop computers to any attorneys, including attorneys with the SKG, or attorneys for the state or federal government, based in part on the "government investigation privilege" and because doing so might "implicate an ongoing governmental investigation." (C. Rigsby Dep. at 148:9-152:11.) How so remains a mystery.

- Kerri's attorneys instructed her not to testify about an agreement involving Kerri and her lawyers "whereby [Kerri] has a contingency arrangement leaving [her] in a situation where [she] could recover money." (K. Rigsby Dep. at 341:8-342:16.) Scruggs instructed Kerri not to discuss the matter because "we are not, under federal law, at liberty to talk about" the litigation involving the contingency agreement. (*Id.*) Scruggs later stated that Kerri was involved "in a matter that's prohibited from disclosure by federal law." (*Id.* at 360:25-362:24.) But Kerri's attorneys never identified the federal law or federal instruction he claims prevented Kerri from discussing whether she had entered into an agreement to split a contingency fee with her attorneys. (*See id.*)

Without more information about both the legal nature and factual basis for the Rigsbys' "law enforcement" privilege claims, State Farm cannot determine whether the Rigsbys' attorneys' instructions that their clients refuse to answer these questions are justified.

The Sisters' failure to supply any details to support their assertion of the "law enforcement privilege" is unsurprising given that "[t]he purpose of the privilege in the Fifth Circuit is to protect from release documents relating to an ongoing criminal investigation." *In re U.S. Dep't of Homeland Sec.*, 459 F.3d at 570 n.2; *see also id.* at 570 n.1 ("Other circuits also recognize the law enforcement privilege as covering documents relating to ongoing criminal investigations."). Here, the Rigsbys' written objections to State Farm's document requests do not even mention the law enforcement privilege. And

the questions to which the Rigsbys' attorneys objected on law enforcement privilege grounds do not call for the release of any documentary evidence.

Moreover, as private parties, the Rigsbys almost certainly lack standing to assert a law enforcement privilege. Rather, the privilege "can only be asserted by the head of [a governmental] agency." *Jones v. DeRosa*, 238 F.R.D. 157, 165 (D.N.J. 2006); *First Nat'l Bank of Louisville v. Lustig*, 1993 WL 205044, at *3 n.2 (E.D. La. June 4, 1993) (overruling assertion of the investigatory privilege by private party and the government on the grounds that the purportedly privileged material was held by the private party and not the government).

In addition, even if a privilege does apply, it appears the Rigsbys' attorneys have wildly abused it. At a minimum, the Rigsbys should be forced to identify the federal law or federal instruction they claim prohibits them from disclosing whether they entered into an agreement to split a contingency fee with their attorneys. *See* K. Rigsby Dep. at 341:8-342:16. The Rigsbys should also be compelled to testify about any formal or informal offers or grants of immunity they may have discussed or received, as these relate directly to their potential bias as witnesses. K. Rigsby Dep. at 298:22-299:21; C. Rigsby Dep. at 79:24-80:7. To the extent the Rigsbys claim a law enforcement privilege prevents them from disclosing whether they provided State Farm laptops to their civil attorneys or any other parties, they should be compelled to explain how and why the privilege applies. C. Rigsby Dep. at 148:9-152:11.

## V.     The Rigsby Sisters Should Be Compelled to Comply with State Farm's Document Requests

As noted, both Kerri and Cori Rigsby showed up to their depositions without a single document. Their testimony makes clear that both Sisters failed to make even minimal efforts to comply with their obligations upon receipt of their Notice of Video Deposition with Document Request. The Rigsbys should be ordered to produce all responsive materials within their actual or constructive "possession,

custody or control," as required by Rule 45 of the Federal Rules of Civil Procedure.[66]  *See* Fed. R. Civ. P. 45(a)(1)(C).

A non-party is obligated to produce all responsive documents within her "possession, custody or control." *Id.*  Under Rule 45, "possession, custody or control" is given the same meaning as under Rule 34 of the Federal Rules of Civil Procedure. *Id.*, advisory committee's notes, 1991 amends. ("The non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34.").  "A party responding to a discovery request under Fed. R. Civ. P. 34 must review all the files in its possession which may contain documents responsive to its adversary's request." *MTB Bank v. Fed. Armored Express, Inc.*, No. 93 Civ. 5594, 1998 WL 43125, at *5 (S.D.N.Y. Feb. 2, 1998).  "This rule is broadly construed to encompass both actual and constructive possession." *Thomas v. Deloitte Consulting LP*, No. 3-02-CV-0343-M, 2004 WL 1372954, at *4 (N.D. Tex. June 14, 2004).

The Rigsbys' deposition testimony demonstrates that they failed to seek information called for in the production requests attached to the subpoenas.  Cori Rigsby testified that, after she received the notice and document request in this matter, she "basically . . . sat on it for a couple of days." C. Rigsby Dep. at 18:9-11.  Though she eventually located some responsive documents, she did not bother to bring them to her deposition. *Id.* at 19:17-20:1.  Cori Rigsby further testified that she made no effort to search many of the locations where she may have stored responsive documents, including her garage and various mini storage units rented by her and her ex-husband. *Id.* at 20:13-19.  Kerri Rigsby's effort to locate and produce responsive materials was similarly insufficient.  Although she testified that she looked for documents in her house, she acknowledged that "it would be difficult to collect any of those

---

[66]  That the Rigsbys' attorneys agreed to accept service of a Notice of Deposition in lieu of a subpoena *duces tecum* does not change their obligations under the Federal Rules.

documents [responsive to the subpoena] because they are not there at that residence." K. Rigsby Dep. at 19:17-20:3.

Thus, Cori's testimony that she is "not . . . aware" of any documents that relate to key issues in this case – such as her employment with the SKG or her introduction to Scruggs by her mother – lacks any probative force. C. Rigsby Dep. at 31:4-34:3. Similarly, Mr. Hawley's assertion that "[n]either Kerri nor Cori currently possess any [documents subject to Judge Acker's injunction]" cannot be accepted at face value. K. Rigsby Dep. at 58:18-24 (Statement of Mr. Hawley). In fact, even Mr. Hawley acknowledged that some documents subject to Judge Acker's injunction might still "show up." *Id.* at 58:23.

The Rigsby Sisters' minimal efforts do not come close to complying with their obligations to "review all the files in [their] possession which may contain documents responsive" to the subpoenas and produce them. *MTB Bank*, 1998 WL 43125, at *5. They should therefore be ordered to conduct a diligent search of their homes, any storage units where responsive documents might be located, their friends' and parents' homes, their lawyers' offices, and any other possible repositories of materials responsive to the document requests attached to the subpoenas.

Mr. Hawley attempts to muddy otherwise clear waters on this essential point by claiming that any document supporting the Sisters' claims of wrongdoing by State Farm that might "show up" would be subject to the injunction issued by Judge Acker. *See* K. Rigsby Dep. at 58:18-24. But State Farm is not requesting that the Sisters *produce* any documents subject to Judge Acker's injunction. Rather, State Farm seeks an order requiring the Sisters to conduct a diligent search so they can: (i) state on the record in this case – under penalty of perjury and without equivocation – that they either have or do not have any of the 15,000 documents (or copies thereof) that are subject to Judge Acker's injunction; and (ii) produce all responsive documents that are not subject to the injunction.

The Rigsbys also failed to make any effort to obtain any documents over which they have constructive possession. Under Rules 34 and 45, a party must produce documents when the party "has the legal right to obtain the documents on demand." *See, e.g.*, *Wardrip v. Hart*, 934 F. Supp. 1282, 1286 (D. Kan. 1996) (ordering party to produce tax returns and other financial information held by party's accountant). Thus, a subpoena recipient is obligated to obtain financial records in the physical possession of agents such as accountants or banks. *See id.*; *see also, e.g.*, *Thomas*, 2004 WL 1372954, at *4-5 (ordering third party to obtain and produce bank and credit card statements or authorize defendants to obtain records from bank); *La. Carpenters Reg'l Council v. Creech*, No. CIVA04-3276, 2006 WL 1968929, at *1 (E.D. La. July 7, 2006) (ordering production of bank and credit card account monthly statements where discovery recipient "reported that he did not retain copies of the accounts").

Here, the Rigsbys testified that they made no effort to obtain responsive documents within their constructive possession. For example, Cori testified that she did not obtain her tax records from her tax preparer. C. Rigsby Dep. at 21:4-9. Kerri also testified that she did not contact the tax preparer who has physical possession of her tax-related documents, (K. Rigsby Dep. at 23:16-19), nor did she obtain her pay stubs from her employer, or banking records or credit card receipts from the financial institutions that maintain them. *Id.* at 22:21-23:13 & 75:4-19.

Similarly, the fact that Kerri Rigsby claims to have thrown out her bank statements because she "banks online" and does not maintain physical copies of her bank records, *id.* at 23:5-8, does not excuse her failure to produce her bank records. Nor does the absence of a paper record excuse either Rigsby's failure to obtain numerous other responsive documents that are undoubtedly available to them in electronic form (such as credit card statements and cellular phone bills). Indeed, Rules 34 and 45 were amended in 2006 to make express a party's obligation to produce documents stored in electronic form. *See* Fed. R. Civ. P. 34(a) (authorized discovery includes "electronically stored information . . . stored in any medium from which information can be obtained"); *id.*, advisory committee's notes, 2006 amends.

34

("Rule 34(a) is amended to confirm that discovery of electronically stored information stands on equal footing with discovery of paper documents."); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 428 (S.D.N.Y. 2002) (denying request for protective order barring production of e-mails because "[e]lectronic documents are no less subject to disclosure than paper records").

Kerri and Cory Rigsby should therefore be ordered to obtain responsive materials from any third party from whom they could request the documents, including tax returns and related documents from their tax preparers; their bank records and credit card statements from the relevant financial institutions; and any documents related to their employment with the SKG.

## CONCLUSION

For the foregoing reasons, State Farm respectfully requests that this Court enter an order: (i) overruling Cori and Kerri Rigsby's privilege objections in their entirety; (ii) compelling them to comply with State Farm's document requests; and (iii) ordering that State Farm shall be entitled to depose Cori and Kerri Rigsby for an additional four hours each.

Dated: May 30, 2007                              Respectfully submitted,

s / H. Benjamin Mullen
John A. Banahan (MSB #1761)
H. Benjamin Mullen (MSB #9077)
BRYAN, NELSON, SCHROEDER,
  CASTIGLIOLA & BANAHAN
4105 Hospital Road, Suite 102-B
Pascagoula, Mississippi 39567
(228) 762-6631

Dan W. Webb (MSB #7051)
Roechelle R. Morgan (MSB #100621)
WEBB, SANDERS & WILLIAMS, PLLC
363 N. Broadway Street
Tupelo, Mississippi 38802-0496
(662) 844-2137

*Attorneys for State Farm Fire and Casualty Company*

35

## CERTIFICATE OF SERVICE

I, **H. BENJAMIN MULLEN**, one of the attorneys for the Defendant, **STATE FARM FIRE & CASUALTY COMPANY**, do hereby certify that I have this date electronically filed the foregoing Memorandum of Law in Support of State Farm's Motion to Compel with the Clerk of Court using the ECF system which sent notification of such filing to the following and further that I this day mailed, postage prepaid, a true and correct copy of the foregoing Memorandum of Law in Support of State Farm's Motion to Compel to:

Sidney A. Backstrom, Esquire            Larry G. Canada, Esq.
Zach Scruggs, Esquire                   GALLOWAY, JOHNSON, TOMPKINS,
Richard F. Scruggs                          BURR & SMITH
THE SCRUGGS LAW FIRM, P.A.               701 Poydras Street, Suite 4040
Post Office Box 1136                     New Orleans, LA  70139
Oxford, MS 38655

THIS the 30th day of May, 2007.


                                          s/H. Benjamin Mullen
                                        H. BENJAMIN MULLEN


**H. BENJAMIN MULLEN
MS BAR NO.:  9077
JOHN A. BANAHAN
MS BAR NO.: 1731**

BRYAN, NELSON, SCHROEDER,
CASTIGLIOLA & BANAHAN
Attorneys at Law
1103 Jackson Avenue
Post Office Drawer 1529
Pascagoula, MS  39568-1529
Tele:  (228) 762-6631
Fax: (228) 769-6392
Email:  ben@bnscb.com