IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

THOMAS C. and PAMELA McINTOSH                                    PLAINTIFFS

VS.                                        CIVIL ACTION NO. 1:06-CV-1080-LTS-RHW

STATE FARM FIRE & CASUALTY                                       DEFENDANTS
COMPANY; FORENSIC ANALYSIS &
ENGINEERING CORPORATION and
E.A. RENFROE & COMPANY, et al.

MEMORANDUM IN SUPPORT OF MOTION TO COMPEL
DEPOSITION OF PETER BARRETT AND
PRODUCTION OF DOCUMENTS BY PETER BARRETT

Thomas C. and Pamela McIntosh ("Plaintiffs") respectfully move to compel the

deposition of and production of documents from Peter Barrett. In response to a subpoena served

on Mr. Barrett, both he and State Farm have objected on grounds of attorney/client privilege and

work product. In support of their Motion to Compel, Plaintiffs state as follows:

I.
INTRODUCTION

State Farm first defrauded the Plaintiffs by fraudulently concealing and then altering a

October 12, 2005 Forensic Engineering report which implicated full coverage in favor of

Plaintiffs under their State Farm policy. When ABC's "20/20" television program discovered

this fraud and questioned a State Farm lawyer about it a year later, State Farm then attempted to

both further and coverup that fraud by instructing Peter Barrett, a lawyer with the Butler Snow

law firm, to meet with the McIntoshes and falsely represent to them that there was no original

October 12 Report. State Farm also instructed Mr. Barrett to obtain a signed statement from the

Plaintiffs (without informing them of the existence of the October 12 report) saying that they

were "satisfied" with how State Farm adjusted their claim and that anyone in possession of his

engineering reports, specifically listing media and ABC news, should respect his privacy and not publicize the reports.

State Farm's instructions and communications to Barrett in this regard were not for litigation purposes, because none was imminent at that time and obviously an unrepresented person's being "satisfied"with their claim has no affect whatsoever on litigation if later filed. Moreover, no legal advice was sought from Barrett, who had made no appearances for State Farm in Katrina cases before this task or since. Rather, State Farm told Barrett what to do and he did it. Lastly, State Farm's communications and instructions to Barrett directly relate to its efforts to both further and cover up its fraudulent denial of the Plaintiffs' claim and concealment of the October 12 report. As such, these communications are not protected from disclosure pursuant to the Crime-Fraud exception to the Attorney-Client Privilege.

Given these facts, Barrett and State Farm cannot validly seek to cloak Barrett's actions and the correspondence surrounding it in privilege. This Court should therefore compel his deposition and the production of documents he admits he has.

## II.
## FACTUAL BACKGROUND

Plaintiffs' principal cause of action against State Farm, Forensic Analysis & Engineering Corporation ("Forensic"), and E. A. Renfroe & Company ("Renfroe") is one of the fraud; both in the denial of their homeowners' claim and the subsequent cover up of that fraud through all of their employees and Peter Barrett.

As to the initial "front end" fraud, Plaintiffs allege that State Farm first defrauded them in October 2005 by: (1) fraudulently concealing from them an October 12, 2005 Forensic Engineering report ("October 12 report") that State Farm commissioned on their property, which

concluded that all of the damage to their home was caused by <u>wind</u> and therefore implicated full coverage under their homeowners' policy; (2) fraudulently changing the conclusions of the favorable October 12 report by coercing Forensic to issue a new report on October 20, 2005 ("October 20 report") which fraudulently concluded that all of Plaintiffs' damage was caused by <u>water</u> and thus excluded by the policy; and then (3) fraudulently denying their claim on October 28, 2005 based solely on the subsequent October 20 engineering report. Evidence substantiating State Farm's "fraud" is set forth in the Amended Complaint (Exhibit "A"); the October 12 Report (Exhibit "B"); the October 20 Report (Exhibit "C"); the September 28, 2005 denial letter (Exhibit "D"); Internal Forensic emails (Exhibit "E") and Deposition testimony of Kerri Rigsby (Exhibit "F") and Cori Rigsby (Exhibit "G").

Plaintiffs accepted this fraudulent denial in reliance on the October 20 report and without any knowledge of the October 12 report that implicated full coverage under their homeowners' policy. Plaintiffs accordingly never contacted any attorney or considered any legal action in reliance on the representations made in the October 28, 2005 denial letter and considered the matter closed, as did State Farm.

Then, almost one year later, ABC News came into possession of the original October 12 report on Plaintiffs' property while preparing a 20/20 news story on State Farm's handling of Katrina damage claims. On August 15, 2006, ABC confronted State Farm with the October 12 report (with the sticky note affixed to it instructing State Farm personnel to "Put in Wind file - DO NOT Pay Bill DO NOT discuss,") during an interview with its designated spokesman, Wayne Drinkwater.

Having notice that 20/20 was in possession of the October 12 report, with the sticky note affixed to it, State Farm sprung into action in order to prevent 20/20 from airing the story. A

-3-

mere two days later, State Farm in-house counsel Tamara Rennick cold-called the McIntoshes

solely to ask if they would agree to meet with Peter Barrett, one of their local attorneys. See

Amended Complaint at ¶50. The very next day, Barrett called the McIntoshes to arrange a

meeting "as soon as possible." That meeting occurred on August 21, 2006. *Id.* at ¶51.

At that meeting, Barrett falsely represented to the McIntoshes that the October 12 Report

did not exist. See Amended Complaint at ¶50. Instead, Barrett falsely represented to the

McIntoshes that there were only two copies of the same October 20 report and presented them

with only those two copies. *Id.* at 50. In making these false representations, Barrett even went

so far as to mention a post it note to McIntosh as set forth in ¶53 of the Amended Complaint as

follows:

> 53.    Mr. McIntosh again relayed to the State Farm representatives that
> the Attorney General's office had told Mr. McIntosh of the existence of two
> different engineering reports. Mr. Barrett revealed that there were two reports,
> but produced to Mr. McIntosh only two versions of the October 20th report. Mr.
> Barrett then falsely and fraudulently represented to Mr. McIntosh that State Farm
> was trying to "go paperless" and that one was the "file copy" and the other was
> the scanned image of the "file copy." After reviewing those reports with Mr.
> McIntosh, Mr. Barrett also mentioned to Mr. McIntosh that he may hear
> something about or there would be some discussion of a "post-it note" but that
> post-it notes can be moved or stuck to anything and sometimes don't mean what
> they say. Mr. Barrett was clearly aware of the "post-it note" found on the
> October 12 Forensic report which stated "Put in Wind file - DO NOT Pay Bill DO
> NOT discuss." He did not, however, reveal the content of that "post-it note" to
> Mr. McIntosh nor did he reveal the existence of the October 12 Forensic report.

After falsely representing and concealing the October 12 report to Plaintiffs, Barrett then

handwrote a statement which Mr. McIntosh signed, without the benefit of the October 12 report.[1]

*See*, Exhibit "H." Importantly, the document did not purport to release any claim McIntosh had

---

[1]Plaintiffs have a real reason to question whether Mr. Barrett violated the Model Rules of Professional
Conduct, specifically Rules 4.1, Truthfulness in Statements to Others and 4.3, Dealing with
Unrepresented Person.

or may have had.  Instead, as to his insurance claim it only noted that Mr. McIntosh was "satisfied that the adjustment and payment under these State Farm policies was done correctly." Additionally, and of importance here, the statement focused on the October 12th report and it being in the hands of the media.  The statement noted that Mr. McIntosh "had been advised that parties other than State Farm had possession of copies of my State Farm engineering report" and that Mr. McIntosh "did not . . . authorize any (sic) one to release my report to any third party including but not limited to any member or organization in the <u>media industry</u> (<u>ABC news</u>, the Sun-Herald, CBS news, Associated Press) or any other news reporting organizations." (emphasis added)

The statement went on to address publication of his engineering reports to <u>media</u> stating that Mr. McIntosh considered "anyone in possession of a copy of my report to be committing a violation of my privacy and <u>any broadcast</u> of any information regarding my State Farm insurance transactions to be aggravating the aforementioned invasion of my privacy." (emphasis added)

The statement continued "I authorize State Farm to advise <u>media outlets such as ABC news</u> and any other outlet having possession of my report of my concern for my privacy; and <u>to advise any such outlet that I have no dispute with State Farm</u> . . ." (emphasis added)

Finally, the statement ends "Put another way, I wish to be left alone."

Notably, in State Farm's Answer to the Amended Complaint (which was not timely filed),[2] State Farm does not even attempt to suggest that Mr. McIntosh's signed statement resulted in a release of his claims against them.  The significance of this cannot be overstated. The lack of legal effect of the statement clearly reveals that Barrett's request for a meeting on

---

[2]Plaintiffs' Motion for Default Judgment is pending before this Court.

"as soon as possible" basis was not "in anticipation of litigation" as he argues. Rather, it was a desperate attempt to kill a hard-hitting national news story about State Farm's Katrina claims handling practices. There was nothing legal about it.[3] As such, Barrett's work product objection based on the document being created in anticipation of litigation must fail.

Because State Farm informed Barrett of what they needed him to do, (and which he did on an emergent basis), did not seek any advice from Barrett, and certainly did not seek legal advice given that this was a public relations issue only at that time, his attorney client privilege objection must be overruled as well.

III.

## LAW AND ARGUMENT

On June 4, 2007, Plaintiffs served a subpoena on Peter Barrett seeking specific documents and e-mails between him and State Farm relating to his communications with Plaintiffs and his obtaining a statement for them requesting the following:

1.    All e-mails, letters, faxes and other forms of communication between you and Tamara Rennick, Susan Hood, Bob Trippel, Jeff Jackson, Kim Brunner, Wayne Drinkwater, Terry Blaylock, John Dagenhart, and Ken Turner regarding: (1) Plaintiffs, Chris and Pamela McIntosh's Homeowner's Claim; (2) Forensic Engineering's October 12, 2005 and October 20, 2005 Engineering Reports; and (3) ABC's 20/20 news broadcast relating to the Rigsby sisters and/or Plaintiffs' Homeowner's Claim; all from August 15, 2006 to September 9, 2006.

2.    All e-mails, letters, faxes and other forms of communication between you and any other State Farm employee or representative or third party regarding: (1) Plaintiffs Chris and Pamela McIntosh's Homeowner's Claim; (2) Forensic Engineering's October 12, 2005 and October 20, 2005 Engineering Reports; and (3) ABC's 20/20 news broadcast relating to the Rigsby sisters and/or Plaintiffs' Homeowner's Claim; all from August 15, 2006 to September 9, 2006.

_____

[3]All the facts regarding State Farm's attempts to cover up this fraud are laid out in greater detail in ¶¶ 49-60 of the Amended Complaint.

    3.     All e-mails, letters, faxes and other forms of communication between you and Tamara Rennick, Susan Hood, Bob Trippel, Jeff Jackson, Kim Brunner, Wayne Drinkwater, Terry Blaylock, John Dagenhart, and Ken Turner regarding your and Ken Turner's August 21, 2006 visit and/or interview with Plaintiffs Chris and/or Pamela McIntosh, from August 15, 2006 to September 9, 2006.

    4.     All e-mails, letters faxes, and other forms of communication between you and any other State Farm employee or representative 'or other third party regarding your and Ken Turner's August 21, 2006 visit and/or interview with Plaintiffs Chris and/or Pamela McIntosh from August 15, 2006 to September 9, 2006.

On June 15, 2007, Mr. Barrett filed an objection to this subpoena alleging in blanket

fashion with no factual or legal support, arguing that all of the documents and communications

between him and State Farm were privileged and thus not discoverable.[4]

## A.  BARRETT'S OBJECTIONS

Mr. Barrett's first objection is that the documents sought are "attorney/client privileged."

Second is that the documents were created "in anticipation of litigation" and therefore are

protected by the work product doctrine. Neither is applicable here. First, though Barrett claims

the attorney/client privilege, his objection never states that he was actually giving legal advice, a

necessary pre-requisite for the privilege to apply to State Farm. See Barrett Objection at p. 2, ". .

. the documents requested by the Plaintiffs were exchanged between Barrett and State Farm

---

[4]While Mr. Barrett's counsel has not refused to present Mr. Barrett for a deposition, it is clear that said counsel is not planning on allowing Mr. Barrett to be questioned about any subject other than the statement of Mr. McIntosh itself which, of course, would be a waste of time. Specifically, counsel for Barrett has said in an e-mail dated July 27, 2007 "I did want to alert you to our position beforehand about what we are willing to allow Peter to discuss. As I can appreciate his potential testimony, he (sic) would be subject to cross-examination about conversations with your clients, but anything beyond that, would require him to disclose Attorney-Client information, which we are taking the position is confidential and only State Farm can waive. It may very well be that we'll have to simply take the deposition, make our objections, and then have the Magistrate rule upon the specific questions objected to . . . ."

Ruling on the assertions of privilege now would avoid the futile exercise contemplated by the above transmission.

employees and/or legal counsel during the course of his undertaking as an attorney for State

Farm." Barrett Objection at p. 2.   " . . . [the subpoena] seek[s] information from Barrett that

was generated between he and his client (State Farm) during the course and scope of, and

presently during the existence of, an attorney/client relationship." *Id.*   Neither statement

affords protection to the requested information. Mr. Barrett's burden, in claiming the benefits of

the attorney/client privilege, is to affirmatively show that State Farm was requesting legal advice

and that he was providing it. He has not done so.

In fact, Barrett's additional statements belie his argument that the documents requested

are within the attorney/client privilege. He notes that he did find emails which he states are

"communications between State Farm's outside legal counsel and/or in-house legal counsel."

Objection at p. 4. (emphasis added)   Importantly though, "Predominantly, Peter Barrett was <u>a</u>

<u>recipient</u> of these communications along with other lawyers retained by State Farm to assist in

their defense of Katrina related matters. . . ." *Id.* at p. 4. (emphasis added)   Being <u>one</u> recipient

of emails from a client does not automatically cloak the communication in privilege. The client

must be requesting legal advice and Mr. Barrett must be providing it.[5]

These statements beg the question, who is it that is "rendering" the legal advice? In the

emails found by Mr. Barrett, he was "predominantly . . . a recipient of these communications . .

---

[5]Mr. Barrett's affidavit adds nothing to his argument. In it, he again simply confirms that there are
communications between he and State Farm. However, there is no specific allegation (and certainly no
support offered) for the assertion that he was providing legal advice to his client. (". . . Further, the
documents requested by the Plaintiffs are communications between the undersigned and State Farm
employees and/or legal counsel that occurred during the course of my legal representation of State Farm
and were made for the purposes of rendering legal advice and intended to remain confidential. As such,
they are clearly protected by the attorney/client privilege.") See p. 1 of Barrett Affidavit.

Other of his statements provide no help and are confounding at best. For example, the following
comment from Barrett seems to assert both the attorney/client privilege and work product doctrine
without supporting either (". . . all documents . . . would only occur as a consequence of my capacity as
their outside and separately retained legal counselor.") Id. at ¶5.

-8-

." If that is the case, then it is clear that he was not providing legal advice during those exchanges. Moreover, the fact that his only involvement in this case occurred two days after State Farm became aware of the fact that 20/20 had the McIntosh reports in its possession, that he obtained a written statement from Mr. McIntosh that had no legal significance whatsoever, and that he has not done a thing since then for State Farm, all indicate that there was no request by State Farm for legal advice and no provision of legal advice by Mr. Barrett and therefore there is no attorney/client privilege.[6]

## B.    LEGAL STANDARD FOR THE ATTORNEY/CLIENT PRIVILEGE

Under Rule 26(b)(1) "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . ." The attorney/client privilege is one such privilege that can keep information from being discoverable. In order for it to apply each element must be met. Those elements are perhaps best stated by Professor Wigmore as follows:

> (1) [w]here legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such (3) the communications relating to that purpose (4) are made in confidence (5) by the client (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor (8) except the protection be waived.

---

[6]State Farm joined in the Objection and only weakly suggested that the information sought "concern(ed) central issues in this matter" and then similar to Mr. Barrett states, "communications were made in anticipation of litigation or in connection with pending litigation, for the purposes of obtaining or rendering legal advice." (State Farm Objection at p. 2.) This statement does not even touch on all of the requirements for the attorney/client privilege to apply. It also does not state how or why the documents were in anticipation of litigation. And in any event State Farm provides no factual support for this statement even if it were relevant. Rather, it too is just a blanket assertion of privilege that case law reveals is clearly inappropriate.

In addition, Plaintiffs do not disagree that the Barrett documents and Barrett testimony are essential to the issues in this matter. Mr. Barrett's attempts to kill the 20/20 story and silence any negative publicity that would visit State Farm for defrauding the McIntoshes is extremely relevant to the bad faith claim against State Farm herein. This information will show that State Farm, at a very high level (its office of general counsel), knew about the fraudulent engineering reports and did everything in its power to prevent public knowledge and the McIntoshes' knowledge of them from coming to light.

8 J. Wigmore, Evidence, §2292 at 554 (McNaughton Rev. Ed. 1961). *See, United States v. United Shoe Machinery Corp.,* 89 F. Supp. 357 (D.Mass. 1950). *And see,* Rule 502(b) of the MISSISSIPPI RULES OF EVIDENCE which defines the attorney/client privilege as the client's right to refuse to disclose and prevent others from "disclosing confidential communications made for the propose of facilitating the rendition of professional legal services to the client."[7]

    This privilege is strictly construed. *Radiant Burners, Inc. v. American Gas Association,* 320 F.2d 314, 323 (7th Cir. 1963). *In re LTV Securities Litigation,* 89 F.R.D. 595, 600 (N.D. Tex. 1981). And the burden of showing its application rests with the party seeking to prevent the discovery. *In re Santa Fe Intern. Corp.,* 272 F.3d 705 (5th Cir. 2001). *United States v. Miller,* 660 F.2d 563, 570 (5th Cir. 1981). *Also, see generally,* 8 Charles Alan Wright & Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE §2016.1 (2nd ed. 1994). A blanket assertion of privilege, like that of Mr. Barrett and State Farm, has no effect. Cases are myriad on this point. *See, United States v. White,* 970 F.2d 328, 334 (7th Cir. 1992) ("A blanket claim of privilege, which does not specify what information is protected, will not suffice."); *United States v. Rockwell,* 897 F.2d 1255 (3rd Cir. 1990) ("A blanket assertion of the privilege was not permissible. The privilege would have to be asserted document by document."); *United States v. Exxon Corp.,* 87 F.R.D. 603 (D.D.C. 1980) ("An index had to be created setting forth the basis of each claim of privilege.") *Bramante v. McClain,* 2007 WL 102314 (W.D. Tex. 2007) *citing United States v. El Paso Co.,* 682 F.2d 530, 539 (5th Cir. 1981) (stating that the attorney/client privilege must be asserted with respect to particular documents). "A proper claim of privilege requires a specific

---

[7]Under Rule 501 of the FEDERAL RULES OF EVIDENCE state law determines the applicability of a privilege in a civil diversity action where state law supplies the rule of the decision. *Dunn v. State Farm,* 927 F.2d 869, 875 (5th Cir. 1991).

designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality. Unless the affidavit is precise to bring the document within the Rule, the Court has no basis on which to weigh the applicability of the claim of privilege . . .a party resisting disclosure on the ground of attorney/client privilege must by affidavit show sufficient facts as to bring the identified and described document within the narrow confines of the privilege." *International Paper Company v. Fibre Board Corp.*, 63 F.R.D. 88, 94 (D. Del. 1974).

In this case, there has not been "a specific designation and description of the documents within [the attorney/client privilege's] scope." Neither Mr. Barrett or State Farm has presented "precise and certain reasons for preserving their confidentiality." Likewise, there has been no showing of "sufficient facts as to bring the identified and described document within the narrow confines of the privilege." Peter Barrett has not described his relationship with State Farm either before his actions in this case, during his actions in this case, or after his actions in this case. He has not explicitly stated that State Farm was seeking legal advice. He has not explicitly stated that he gave them legal advice. He has not shown that the communications related to a <u>legal</u> issue. In fact, the statement that Barrett produced plainly reveals that it concerned a public relations and not a legal issue. The statement repeatedly references "the media," repeatedly emphasizes that the insured considers the dissemination of his engineering reports to be "a violation of his privacy" and finally authorizes State Farm to advise media sources of this

concern on Mr. McIntosh's behalf.[8]  As such, Barrett has satisfied none of the elements that he

bears the burden of proving in order for the attorney/client privilege to apply.[9]

     In this context it is clear that Mr. Barrett was functioning more as a public relations

emissary for State Farm than a lawyer.  Even assuming that State Farm had asked Mr. Barrett

what he thought needed to be done about 20/20's knowledge of the reports, and even assuming

that Mr. Barrett came up with the idea to have Mr. McIntosh sign the statement emphasizing his

desire for privacy, the very first element of the attorney/client privilege would not be met

because no "legal advice of any kind" would have been sought.  Additionally, the second

element would also not be met because Mr. Barrett would not have been functioning as a "legal

advisor in his capacity as such."  Strictly construing the privilege as this Court must, it becomes

clear that there is no privilege relating to Mr. Barrett's actions.

     Compelling the production of these documents and compelling the deposition of a lawyer

is not unprecedented.  Rather, it is quite common.  Numerous cases support the proposition that

the attorney/client privilege does not apply simply because there was a conversation between a

person and his lawyer.  *See, United States v. Kelly,* 569 F.2d 928, 938 (5th Cir. 1978) ("The

attorney/client privilege attaches only to the communications made in confidence to an attorney

by that attorney's client for the purposes of securing legal advice or assistance."); *North*

---

[8]If the Court is of the opinion that Barrett was performing a legal function, Barrett's having gotten Mr.
McIntosh to "authorize" Barrett's informing 20/20 of Mr. McIntosh's wishes would have implicated the
attorney/client privilege but the client in that scenario would not be State Farm, it would be Mr. McIntosh
whom the privilege cannot be asserted against.  Similarly, Ms. Rennick also professed to being in an
attorney/client relationship with Mr. McIntosh in her email to him, see footnote 14, *infra,* and again to
the extent the Court finds that State Farm's machinations were "legal" machinations, her correspondence
to Barrett or anyone else would not be protected from disclosure to Mr. McIntosh.

[9]On information and belief, Barrett and State Farm have waived this privilege in any event.  In connection
with Attorney General Hood's investigation, State Farm and Barrett turned over all of the information
they now seek to protect.

*American Mortgage Investors v. First Wisconsin National Bank*, 69 F.R.D. 9 (E.D. Wisc. 1975) ("For the privilege to exist, the lawyer must not only be functioning as an advisor, but the advice given must be predominantly legal, as opposed to business, in nature."); *United States v. Johnston*, 146 F.3d 785 (10th Cir. 1998) (". . . the mere fact that an attorney was involved in a communication does not render the communication subject to the attorney/client privilege, a communication between a lawyer and a client must relate to advice or strategy sought by the client."); *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978) (". . . the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice services or advice that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity. The communication is not privileged simply because it is made by or to a person who happens to be a lawyer."); *See also,* 8 Wright and Miller, FEDERAL PRACTICE AND PROCEDURE, CIVIL, §2017, p. 36 (1970 and 1986 Supp.)

In *Diversified* there was no attorney/client privilege because the law firm in that case was not providing legal services. Similar to Mr. Barrett, the law firm was employed solely for the purpose of making an investigation of facts and to make business recommendations with respect to the future conduct of Diversified. In denying the existence of the privilege, the Court stated, "the work that the law firm was employed to perform could have been performed just as readily by nonlawyers aided to the extent necessary by a firm of public accountants." *Diversified*, at p. 609, 610.

In this case the only work that we know that Barrett did was non-legal. His acquisition of Mr. McIntosh's statement was not for a legal purpose. It was for a public relations purpose. This action did not need to be performed by a lawyer at all. Rather, the statement was provided only to 20/20 in an effort to prevent 20/20 from airing its damaging story on State Farm.

In another case with a similar issue, there was no attorney/client privilege in an action against a vessel's insurer arising out of an oil spill when the plaintiffs sought to depose the attorney for the insurer of the vessel. The Court held that services performed by the attorney were simply that of an intermediary when the attorney had: made necessary arrangements for crew members to be hospitalized or buried, engaged in surveying for the purpose of adjusting insurance claims between the carrier and its insured, and arranged for the repatriation of seamen. Such actions were not within the scope and intent of the phrase "acting as a lawyer" and therefore were not privileged. *Puerto Rico v. SS Zoe Colocotroni*, 61 F.R.D. 653, 660 (D.P.R. 1974). *See also, Mission National Insurance Company v. Lilly*, 112 F.R.D. 160, 163 (D.Minn. 1986) ("The privilege did not apply where a law firm was employed by an insurance company to fill its ordinary business function of claims investigation.")

Information gathering like what Mr. Barrett has done has been held to be not protected many times. *See, e.g., ECDC Environmental v. New York Marine and General Insurance Company*, 1998 U.S.Dist. Lexis 8808 at 26 (S.D. N.Y. 1998) ("Information gathered by an attorney regarding an engineering firm was not protected. When the attorney forwarded documents to a client conveying unprotected information concerning the status of cleanup efforts, these are not protected, but documents that conveyed information and also evidence counsel's advice and analysis were protected. In its decision, the Court stated, 'An attorney's communication to a client reporting facts learned by the attorney from a third party is not within the attorney/client privilege unless the information is included in legal analysis or otherwise communicated to the client'.")

## C.    THE CRIME FRAUD EXCEPTION TO THE ATTORNEY/CLIENT PRIVILEGE

Even if it could be stated that all of the elements of the attorney/client privilege have been proved by Mr. Barrett and State Farm, which clearly has not occurred, the information sought would still be discoverable under the crime fraud exception of the attorney/client privilege. This is so because at the time Mr. Barrett was engaged to obtain the statement from Mr. McIntosh, Mr. McIntosh was unaware of the existence of the fraudulent engineering reports and State Farm was aware of it and was attempting to keep that information from Mr. McIntosh.

To determine the applicability of the crime fraud exception a two-prong test must be satisfied. The test was clearly set forth in *In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987). First, there must be a *prima facie*[10] showing that the client was engaged in criminal or fraudulent conduct when the client sought the advice of counsel, that the client was planning such conduct when he or she sought the advice of counsel, <u>or</u> that the client committed a crime or fraud subsequent to receiving the benefit of counsel's advice.[11]    Second, there must a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity, or was related to it. Notably, "for the crime fraud exception to apply, the attorney need not himself be aware of the illegality involved; it is enough that the communication furthered, or was intended by the client to further, that illegality." *In re Grand Jury Proceedings*, 87 F.3d 377, 381-82 (9th Cir. 1996).

---

[10]To make a *prima facie* showing, the proponent of the exception must show that there are sufficient facts for "a prudent person [to] have a reasonable basis to suspect the perpetration of a crime or fraud."*In re Antitrust Grand Jury*, 805 F.2d 155, 165-66 (6th Cir. 1986). *U.S. v. Neal*, 27 F.3d 1035 (5th Cir. 1994) (Once a *prima facie* showing that criminal activity has occurred, the attorney/client privilege may not be asserted.)    *See also*, *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983 (Mark Rich)*, 731 F.2d 1032, 1039 (2nd Cir. 1984).

[11]The crime fraud exception to the attorney/client privilege not only applies to crimes or fraud but also other misconduct. *In re Sealed Case*, 754 F.2d 395 (D.C. Cir. 1985).

Here, Plaintiffs have alleged, in detailed allegations in the Amended Complaint, a fraud, such that "a reasonable person would suspect the perpetration of a fraud."[12] The Amended Complaint reveals that the fraud on Mr. McIntosh was ongoing at the time of his meeting with Mr. Barrett and in addition, it is clear that that fraud continued to be perpetrated on Mr. McIntosh as he was never informed by State Farm or Mr. Barrett of the presence of the two engineering reports in the numerous conversations Mr. McIntosh had with State Farm employees and in his meeting with Mr. Barrett. In fact, it wasn't until June 8, 2007, that State Farm first mentioned the existence of the two reports in a letter to the McIntoshes sent pursuant to the "settlement" with Attorney General Jim Hood. Along with that letter, State Farm provided Mr. McIntosh with both the October 12, 2005 and October 20, 2005 Forensic Engineering reports. However, even in that correspondence State Farm continued to perpetrate the fraud on the McIntoshes by falsely stating that the two engineering reports in their case were the result of "inadvertent duplicate assignments [that were] made on a single property and/or follow up on engineering reports [that were] necessary, resulting in some cases, in multiple engineering reports." See Exhibit "I." Also, there was no indication in that letter that State Farm attempted to "can" the first report in the "Wind file" as the sticky note affixed to the first report so clearly sets forth, "Put in Wind file - DO NOT Pay Bill DO NOT discuss."[13] And as can be seen from the *Grand Jury Proceedings* case, *supra*, Mr. Barrett's subjective understanding (whatever it is)

---

[12]The allegations were so detailed that none of the Defendants filed the traditional Rule 9(b) motion almost automatically filed by defendants each time a fraud case is filed.

[13] The version of the October 12 report attached to the June 8, 2007 letter was a version that did not include the "sticky" note.

of his participation in the fraud is irrelevant. Plaintiffs' believe that Mr. Barrett knew full well
of the fraud being perpetrated on them given his explicit mentioning of the ubiquitous nature of
"sticky notes" in his conversation with Mr. McIntosh but that matters not to the Court's present
inquiry. See Amended Complaint, ¶53. And see p. 4, *supra*.

In a case involving an analysis of almost identical issues to those here, the Court rejected
the assertion of attorney/client privilege based on the application of the crime fraud exception.
*In re John Doe Corp,* 675 F.2d 482 (2nd Cir. 1982). In that case a lawyer performed an internal
investigation that was conducted to persuade third parties that no irregularity had occurred. The
Court found that said investigation was part of the cover up and therefor e resulted in the
unavailability of the privilege.[14]

## D.    LEGAL STANDARD FOR THE ATTORNEY WORK PRODUCT DOCTRINE

The second basis on which Mr. Barrett seeks to preclude discovery in this case is the
work product doctrine. Here again, Mr. Barrett makes only very general assertions and those
assertions are not supported with any facts. Thus this defense should not preclude the discovery
sought.[15] For example, Mr. Barrett stated, ". . . during the time identified in the subpoena, State
Farm was (and still is) involved in numerous lawsuits involving Hurricane Katrina claims. The
documents sought by Plaintiffs have a direct bearing on that litigation. Accordingly, . . . all such

---

[14]It is important to note that "the fraudulent nature of the objective need not be established definitively.
There need only be presented a reasonable basis for believing the objective was fraudulent." *In re
Grand Jury Subpoena Duces Tecum (Mark Rich)*, 731 F.2d 1032, 1039 (2nd Cir. 1984).

[15]Here too, Mr. Barrett has the burden of establishing the privilege.*See Hodges, Grant & Kaufmann v.
Dept. of the Treasury,* 768 F.3d 719 (5th Cir. 1985)("The burden of establishing that a document is work
product is on the party who asserts it . . .")

-17-

documents would be protected from disclosure by the work product doctrine." Objection at p. 3.

Mr. Barrett's statements are not helpful to him for the following reasons. First, the timeframe indicated in the subpoena starts August 15, 2005, a period of two weeks before Hurricane Katrina, so how State Farm could have "been involved in numerous lawsuits involving Hurricane Katrina claims" during that time frame is beyond the undersigned. In fact, Hurricane Katrina litigation did not begin until well into the Fall. In addition, the fact that the documents sought "have a direct bearing on that litigation" only serves to point out the importance of requiring the documents to be produced. If these documents show that State Farm, at its highest level, was directing the efforts of its lawyers to continue to cover up fraud perpetrated by them, then obviously that evidence would be relevant in every case, not just the McIntoshes.

Mr. Barrett's affidavit, a portion of which discusses the work product doctrine, likewise is not helpful to his position. Barrett simply states that ". . . any and all documents that I would have received from or sent to [State Farm] . . . would be done so in the course of a specific undertaking that they believed representation for them was needed and had a reason to anticipate potential litigation with the Plaintiffs herein." *See* Barrett Affidavit at p. 4. In this statement, Barrett only states that his "specific undertaking," getting Mr. McIntosh to sign a document asserting his right to privacy and attempting to have the media not disseminate his engineering reports, "was needed." However, he does not state why it was needed for litigation and one could scarcely imagine how such a statement would be used in litigation. In fact, since the filing

-18-

of this case on October 23, 2006, this document has not been made a part of any filing by State Farm or the subject of any deposition taken to date.

In addition, Mr. Barrett's assertion that State Farm "had a reason to anticipate potential litigation with the Plaintiffs herein" is not supported with any facts nor could it be. The Plaintiffs received a $36,228.37 on September 30, 2005, and since that date had little to no involvement with State Farm until the call out of nowhere from Tamara Rennick and the meeting with Mr. Barrett one day later. The McIntoshes had no lawyer at that point, a fact which both Ms. Rennick and Mr. Barrett were aware. Nor had they threatened any litigation. Case law is clear that such an inchoate and remote possibility of litigation is not the basis upon which the anticipation of litigation defense can be raised.[16]

"The work product privilege is intended to protect from disclosure materials prepared in anticipation of litigation. The inchoate possibility, or even the likely chance of litigation, does not give rise to the privilege." *Diversified*, 572 F.2d at 608. *See also, Woodland v. Nalco*

---

[16]Ms. Rennick's manner of contacting the McIntoshes even furthers the point. After calling Mr. McIntosh on August 16, 2006, Rennick followed up with an email to Mr. McIntosh confirming his "agreeing to meet with attorney Peter Barrett." Across the bottom of that email was the phrase "ATTORNEY CLIENT COMMUNICATION/ATTORNEY WORK PRODUCT." (emphasis in original). From this we can surmise the following: One, that Ms. Rennick, a lawyer, knew Mr. McIntosh was unrepresented. (Otherwise, ethical rules her contacting him.) Unrepresented parties cannot be said to present imminent risk of litigation. In fact, despite the multiple State Farm agents who initiated contact with Mr. McIntosh, none of them has offered an affidavit that they believed Mr. McIntosh was a litigation threat. Two, she was attempting to provide Mr. McIntosh with legal advice, as her email notes (in which case State Farm could be pretty sure that he was not a litigation risk.) Or three, that this was not yet another effort in a string of many to silence the issue by having Mr. McIntosh, a layperson, believe that he was now in some form of attorney client relationship with State Farm!

In the latter case, the documents created by Rennick and Barrett may be attorney/client privilege but Mr. McIntosh would be the "client" and the privilege would not prevent the disclosure of their communications to him. Furthering that point, since McIntosh "authorized" State Farm to inform the media of his view that the discussion of his engineering reports was an invasion of privacy and if State Farm's position that Barrett's actions are "legal" in nature, he too "represented" McIntosh and therefore any documents he has on this subject are not privileged from production to his "client" Mr. McIntosh.

-19-

*Chemical Co.*, 2003 WL 22928808 (E.D. La. 2003) ("Rule 26(b)(3) protects documents prepared by a party's agent from discovery, as long as they were prepared in anticipation of litigation.") In fact, even investigations "of potentially resistible claims 'are not sufficient to immunize an investigative report developed in the ordinary course of business'." *Mission National Insurance Company v. Lilly*, 112 F.R.D. 160 (D.Minn. 1986).

To be in anticipation of litigation courts have made clear that the litigation threat must be "real and imminent;" or that there is a "substantial probability that litigation will occur and that commencement of such litigation is imminent;" or that the prospect of litigation is "identifiable." *See Home Insurance Company v. Ballenger Corp.*, 74 F.R.D. 93, 101 (N.D. Ga. 1977); *In re Grand Jury Investigation (Sturgis)*, 412 F.Supp. 943, 948 (E.D. Pa. 1976); *Stix Prod., Inc. v. United Merchants,* 47 F.R.D. 334, 337 (S.D. N.Y. 1969), respectively.    Here, none of those descriptive terms fit.  In fact, Barrett himself (a lawyer) has chosen not to use them.  And, the statement itself that Barrett procured belies the assertion that litigation was likely.  Mr. Barrett got Mr. McIntosh to agree that he was "satisfied with the adjustment and payment under [his] State Farm policies. . . ."  Finally, on this point, it is interesting to note that none of the almost dozen people that State Farm had talk to Mr. McIntosh during the course of its attempt to cover up the fraud on his case have put in affidavits saying that Mr. McIntosh was a litigation risk. Mr. Barrett's client, State Farm, the one with the "reason to anticipate potential litigation," decided to not even attempt to assert that they were afraid of litigation from Mr. McIntosh.

In similar situations, courts have found no showing of work product because the preparation of documents was for a purpose independent of litigation.  "When it is clear that documents would have been prepared independent of any anticipation of use in litigation (*i.e.*,

-20-

because some other purpose or obligation was sufficient to cause them to be prepared) no work product can attach." *First Pacific Networks, Inc. v. Atlantic Mutual Insurance Company*, 163 F.R.D. 574 (N.D. Cal. 1995). *See also, Occidental Chemical Corporation v. OHM Remediation Services Corp.*, 175 F.R.D. 431, 435 (W.D. N.Y. 1977) (court concluded that a document must be prepared <u>exclusively</u> for litigation in order to constitute work product.) (emphasis added).[17]

## CONCLUSION

The deposition of Peter Barrett and receipt of documents from Peter Barrett is vital to Pam and Chris McIntosh's case. Neither State Farm or Barrett has asserted the valid detailed objections that the rules and case law require for the attorney/client privilege and work product doctrine to be sustained. The documents should be produced and the testimony compelled forthwith so that all of the needed discovery can take place prior to the fast approaching discovery cutoff of September 4, 2007. At a minimum, Barrett and State Farm should be compelled to produce the requested documents to this Court for an *in-camera* inspection whereupon this Court can assess the privileges asserted. Plaintiffs do not believe that such an

---

[17]Even if the Court were to decide that Mr. McIntosh's statement was created in anticipation of litigation, Rule 26(b)(3) provides for a good cause exception to the work product doctrine. In *In re Grand Jury Subpoena Dated November 8, 1979*, 622 F.2d 933, 935 (6th Cir. 1980), the Court set out the following six factors that should be evaluated when a movant asserts that it has shown "good cause" for disclosure: (1) the nature of the information sought; (2) the extent to which the information would reveal the attorney's mental processes; (3) the likely reliability of the information; (4) the degree of danger that the attorney/client relationship would be disrupted; (5) the availability of other sources for the information; and (6) whether the letter or spirit of the 5th or 6th Amendments would be infringed. In this case, none of those factors militate in favor of the defendants. The nature of the information sought is communications from an in-house lawyer to an outside lawyer and simply relate to obtaining a statement that could be presented to media to kill an investigative report. Mr. Barrett's mental processes would not be revealed because there likely are none revealed within the documents. No one can question the reliability of the information. A degree of danger that the attorney/client relationship would be disrupted is a non-factor given the limited and "specific undertaking" of Mr. Barrett and the fact that an expansive review of his or their primary attorneys' files in these matters is not currently sought. There are no other sources of this information. Finally, the 5th Amendment would not be infringed because Mr. Barrett, Ms. Rennick and others are certainly aware of their rights and can assert the 5th Amendment at any time.

intermediate step is needed in this case as there has been no showing whatsoever of a valid

privilege. Accordingly, Plaintiffs move this Court to compel the production of the deposition

and documents sought.

Respectfully submitted, this 31st day of July, 2007.

> **THOMAS C. and PAMELA McINTOSH, PLAINTIFFS**
> By:    */s/ SIDNEY A. BACKSTROM*
> SIDNEY A. BACKSTROM, MSB #99890

Of Counsel:

Richard F. Scruggs
Sidney A. Backstrom
David Zachary Scruggs
Scruggs Law Firm, P.A.
P.O. Box 1136
120-A Courthouse Square
Oxford, MS 38655
Phone: (662) 281-1212

Don Barrett
Marshall Smith
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095
Phone: (662) 834-2376

Mary E. McAlister
Derek Wyatt
Nutt & McAlister
605 Crescent Blvd.
Suite 200
Ridgeland, MS 39157
Phone: (662) 898-7302

Dewitt M. Lovelace
Lovelace Law Firm, P.A.
36474 Emerald Coast Pkwy.
Suite 4202
Destin, FL 32541
850-837-6020

Mike Moore
MOORE LAW FIRM, LLC
P.O. Box 321048
Flowood, MS 39232
601-933-0070

*ATTORNEYS FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 31st day of July 2007, I electronically filed the above and foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following counsel of record:

H. Benjamin Mullen
John A. Banahan
Matthew E. Perkins
Bryan, Nelson, Schroeder,
  Castigliola & Banahan, PLLC
Post Office Drawer 1529
Pascagoula, MS 39568-1529
E-mail: ben1@bnscb.com
E-mail: john@bnscb.com
Email: perkins@bnscb.com

Larry G. Canada
A. Kathryn Breard
Galloway, Johnson, Tompkins, Burr & Smith
701 Poydras Street, Suite 4040
New Orleans, LA 70139
E-mail: lcanada@gjtbs.com
Email: kbreard@gjtbs.com

Laura C. Nettles
Stephen E. Whitehead
Christopher Cobb
Dustin J. Kittle
Lloyd, Gray & Whitehead, PC
2501 20th Place South, Suite 300
Birmingham, AL 35223
Email: lnettles@lgwpc.com
Email: swhitehead@lgwpc.com
Email: ccobb@lgwpc.com
Email: dkittle@lgwpc.com

Dan W. Webb
Roechelle R. Morgan
Webb Sanders & Williams, P.L.L.C.
P.O.Box 496
Tupelo, MS 38802-0496
Email: dwebb@webbsanders.com
Email: rrm@webbsanders.co

Luke Dove
Dove & Chill
4266 I-55 North, Suite 108
Jackson, MS 39211
Email: bethbailev1@aol.com

Drew McLemore Martin
Martin Law Firm, PLLC
4266 I-55 North, Suite 108
Jackson, MS 39211
Email: drewmartinlaw@gmail.com

Joseph M. Hollomon
Law Offices of Joseph M. Hollomon &
Associates
P.O. Box 22683
Jackson, MS 39225
Email: jhollomon@att.net

Gregory H. Hawley
Katherine Rogers Brown
White Arnold Andrews & Dowd
Massey Bldg., Suite 600
2025 Third Avenue N.
Birmingham, AL 35203
Email: ghawley@waadlaw.com
Email: kbrown@waadlaw.com

A copy has this date also been served on counsel for Peter Barrett, via electronic mail to:

    William E. Whitfield, III
    1639 East Pass Road
    Gulfport, MS 399507
    Telephone: 228-863-6101
    Facsimile: 228-863-9526
    Email: whitbill@aol.com

                    /S/ *SIDNEY A. BACKSTROM*
                    SIDNEY A. BACKSTROM