IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

THOMAS C. and PAMELA McINTOSH

                                                              PLAINTIFFS

vs.

                              CAUSE NUMBER: 1:06-CV-1080-LTS-RHW

STATE FARM FIRE & CASUALTY CO.,
ET AL

                                                              DEFENDANTS

PLAINTIFFS' RESPONSE TO STATE FARM FIRE AND CASUALTY
COMPANY'S MOTION TO STRIKE AFFIDAVIT OF DEREK A. WYATT

I. Introduction

After extensive and complete briefing by the Parties regarding disqualification,

State Farm has now launched another salvo against one of the Katrina Litigation Group's

attorneys, Derek Wyatt.  Mr. Wyatt submitted an affidavit ("Affidavit") in support of

Plaintiffs' Responses ("Responses") to the Defendants' Motions to Disqualify

("MTDQs").  In that Affidavit, Mr. Wyatt stated that he did not pay Mr. Ford any money,

nor negotiate the hiring of Mr. Ford in exchange for consulting.  That is true and

Defendant's attempts to cut, paste and combine selected quotes to suggest otherwise is

dishonest.  Defense Counsel have deposed Mr. Ford at length on these exact issues and

his testimony corroborates Mr. Wyatt's affidavit in its entirety.  Mr. Wyatt and Mr. Ford

both have personal knowledge about what transpired; they were there.  Defendants and

their counsel were not.[1]

---

[1]     Defendant's contention that Mr. Wyatt submitted a false affidavit is not only directly rebutted by
the testimony of those present, but it also flies in the face of common sense.  When Mr. Wyatt prepared his
Affidavit, he already had in his possession the Brian Ford documents and had sat through the Brian Ford

Not only is Defendant's latest Motion to Strike ("Motion") unsupported and abusive, it also amounts to a lot of smoke without a fire. As addressed in Plaintiffs' Responses to the MTDQs, it would not have mattered if Mr. Wyatt had either paid money for consultation or negotiated such payments in exchange for consulting (which is not the case). The compensation of consultants for their retention, time, availability, and expertise is both permissible under the law and common in practice.[2]

Notably, Defense Counsel John Banahan and all of his cohorts have still not submitted affidavits swearing that they have never paid any fact witness in any case (including, but not limited to, treating physicians in medical or injury cases) for their time, expertise, and consultation. Regardless of their own practices, Mr. Banahan and his cohorts know or should know that the law allows fact witnesses such as treating physicians to be paid for their time and consultation or, as in this case, a highly skilled

---

testimony. Even if Mr. Wyatt were dishonest (which is not the case), why in the world would he have written an affidavit that was flatly at odds with the record?

[2]     *See Goldstein v. Exxon Research & Eng'g Co.*, 1997 U.S. Dist. LEXIS 14600, 19-20 (D.N.J. 1997)". . . its only effect on the trial in which the witness testimony is received is on that witness's credibility."; *see also United States v. Goff*, 847 F.2d 149, 161 (5th Cir. 1988). ("The credibility of a compensated witness .... is for the jury to determine."); *see also United States v. Medina*, 41 F. Supp. 2d 38, 53-54 (D. Mass. 1999) ("Section 201(c)(2) cannot make it illegal to give anything of value to a witness simply because testimony might eventually be desired, but is not the immediate reason for the exchange. Such an interpretation would make criminal the hiring by the defense of an investigator primarily to gather documents or do surveillance, and possibly testify - an absurd result.").

State Farm does not cite a single authority prohibiting compensation to litigation consultants for attending depositions, preparing for depositions, reviewing documents and the like. In fact, payment for these activities is not contrary to the case law and ethical rules, but is instead supported by both. Pursuant to rule 3.4(b), "occurrence witnesses may be reasonably compensated for time spent in attending a deposition or trial; for time spent in pretrial interviews with the lawyer in preparation for testifying; and for time spent in reviewing and researching records that are germane to his or her testimony." *Centennial Mgmt. Servs. v. Axa Re Vie, et al.*, 193 F.R.D. 671,682 (D. Kan. 2000), citing ABA Comm. on Ethics and Professional Responsibility, Formal Op. 96-402 (1996).    A witness may also be compensated for "consulting on a litigation matter in addition to the time spent providing testimony in a deposition or trial." *Prasad , et al., v. MML Investors Servs, Inc.*, 2004 U.S. Dist. LEXIS 9289, *17-18 (S.D.N.Y.), citing *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 679-80 (D. Kan. 2000) and *New York v. Solvent Chemical Co.*, 166 F.R.D. 284, 289 (W.D.N.Y.).

engineer such as Mr. Ford.  Aside from continuing to misrepresent the law, Defense Counsel and their clients also misrepresent and misunderstand the facts.

The actual facts are simple.  The Scruggs Katrina Group ("SKG") approached Mr. Ford at a time when it represented well over 2000 families on the Mississippi Gulf Coast. SKG had a tremendous work volume and needed qualified engineers to provide assistance and consultation on cases.  Specifically, it needed engineers who were well versed in analyzing wind and water claims issues and who had a specific understanding of Hurricane Katrina.  Such engineers were in short supply.  Brian Ford met all of those criteria and also was not a current employee or independent contractor at that time for the defendant insurance companies, such as State Farm.[3]  Accordingly, SKG wanted to obtain assistance from Mr. Ford on many such cases.  Despite the Defendants' unsupported accusations, Mr. Ford never put his integrity or possible eventual testimony (i.e., concerning those cases in which he had personal knowledge) up for sale.  Nor did SKG attempt to buy such testimony from a "fact witness," as has been alleged without basis.

To further evaluate the possibility of retaining Mr. Ford as a consultant, some SKG lawyers met with Mr. Ford in person and had subsequent email and phone conversations with Mr. Ford.  As the testimony below clearly shows, the lawyers who interacted with Mr. Ford focused on different things.  Mr. Scruggs, as former head of SKG, made many of the hiring decisions regarding consultants and experts.  Mr. Scruggs and others at his office interacted with Mr. Ford regarding possible compensation terms for consultation, which is perfectly legal and acceptable under the law.  Mr. Wyatt, in

---

[3]   Although it was not known by SKG's attorneys at the time Ford was approached, a State Farm claim manager had actually given the directive that Ford be terminated from Forensic.

contrast, focused on the substance of the insurance policyholder claims and the expertise that Mr. Ford had to offer. Put simply, there were two issues: 1) what could Bryan Ford substantively do for SKG as an engineer, and 2) what would the compensation arrangement consist of (i.e., how and how much would Mr. Ford be paid.) Derek Wyatt tried to get Mr. Ford's substantive assistance while Mr. Scruggs tried to negotiate an acceptable consulting arrangement. Again, both acted properly, but independent of one another. The Defendants improperly conflate Mr. Scruggs' and Mr. Wyatt's roles in a desperate attempt to cast a shadow of doubt on Mr. Wyatt's honesty.

There has already been too much lawyering, argument and delay. Plaintiffs respectfully ask the Court to expeditiously deny Defendant's latest attempt at delay and distraction, so that this case can progress to the merits. Instead of cherry-picking out-of-context quotes to turn reality upside down, which is exactly what the Defendants have done in their Motions and Briefs, Plaintiffs will let the record speak for itself. The record demonstrates what Mr. Ford and Mr. Wyatt have known all along and consistently stated under oath. The quoted testimony from Mr. Ford that is proffered herein demonstrates that Mr. Wyatt's affidavit was accurate and that Defense Counsel and their client have knowingly filed a motion to strike that is without basis. It is their Motion to Strike that should be struck.

## II.   Derek Wyatt (And KLG) Never Paid Mr. Ford Any Compensation For Consulting

```
                                337
 3    Q   Is somebody other than you paying your
 4  attorney's fees here today?
 5    A   No.
 6    Q   Do you have an understanding, either expressed
 7  or implied, that Mr. Wyatt, Mr. Scruggs, David Nutt, Meg
```

8   McAlister, or anybody from the SKG or Katrina litigation
9   group is going to pay you something for your services
10   today?
11     A   No.
**12     Q   Have they paid you anything to-date?**
**13     A   No.**
14     Q   Have you asked for payment?
15     A   No.  We discussed a consulting service
16   agreement many months ago and we never reached an
17   agreement.  **We never consummated an agreement.  And**
**18   I haven't provided a service and they haven't paid**
**19   for it.**

                                337
20     Q   You have provided no services?
**21     A   I haven't provided them consulting**
**22       services, no.**
23     Q   Have you kept track of the time you have spent?
24     A   No.
25     Q   No kind of record at all?
                                338
1     A   No.

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).


**III.  Dick Scruggs And Brian Ford Negotiated Possible Payment For Consultation;**
**Derek Wyatt DID NOT**

                                361
6     Q   Did you ever prepare a consulting agreement and
7   submit it to Mr. Wyatt; Mr. Scruggs; Mr. Butterworth;
8   anybody else at the SKG, KLG group?
9        MR. WYATT:  Let me object to that question and ask
10       that you re-state it in a non-compounded way.  You
11       purposely asked a compound question.  There is no way
12       to tell what his answer pertains to.
13        MR. HAHN:  I join in the objection.
14   BY MR. ROBIE:
15     Q   Are you able to answer the question?
**16     A   I submitted a proposal to Mr. Scruggs'**
**17   office at his request.  He asked me to e-mail it to**
**18   his office administrator.**

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).

**IV.  The Proposed Consulting Agreement Was Created By Mr. Ford And Sent To Mr. Scruggs, NOT Derek Wyatt**

362

3    **Q    And when did you send that proposal to**
4    **Mr. Scruggs?**
5        A    May of '07.
. . .
18        **Q    Did you say you sent this in May of '07 the**
19    **proposal to Mr. Scruggs?**  Did you mean to say '06?
20        A    I'm sorry, no, excuse me.  '06.

367

12        **Q    Do you know why Mr. Wyatt was there?**
13        **A    No.**
14        **Q    Do you know why Mr. Scruggs was there?**
15        **A    He wanted to talk to me.  He wanted to see**
16    **what I knew.**

387

1        **Q    Had you already made a proposal to Mr. Wyatt,**
2    **and Mr. Scruggs, and Mr. Butterworth to work as a**
3    **consultant for them?**
4            MR. WYATT:  Object to form.
5            MR. HAHN:  Objection, leading.
6            **THE WITNESS:  To Mr. Scruggs only.**  I don't know
7        who these other attorneys worked for.
8    BY MR. ROBIE:
9        Q    You didn't know who Derek Wyatt is?
10        A    I did not know at the time who they were
11    with.  **Mr. Scruggs asked for that and that's who I**
12    **provided it to.**

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).  *See also* Ford Depo at 390, 388-89, and 498-99.

**V.  Mr. Scruggs (Not Mr. Wyatt) Was Head Of The Former SKG And Negotiated The Potential Business Arrangement Or Payment Of Mr. Ford For Consultation**

413

17        **Q    Did you consider that part of your role was to**
18    **become part of the trial team for Mr. Scruggs, Mr. Wyatt,**
19    **and Mr. Butterworth, and Mr. Versiga?**
20            MR. WYATT:  Object to leading.

6

21       THE WITNESS:  What does trial team mean?
22  BY MR. ROBIE:
23    Q   Whatever cases they were prosecuting.
24       MR. HAHN:  Object to form.
25       THE WITNESS:  I can't answer that.  It was part of

414

1    consulting to **him** [Scruggs].

429

19    Q   **You thought Dickie Scruggs was the group?**
20    A   **Well, he was the head of the group.**

436

**11  Q   Document 254 from Exhibit 17 can you tell us**
**12  what that is?**
13       MR. NORRIS:  Derek, you can have mine.
14       MR. WYATT:  Thank you.
**15       THE WITNESS:  It is my response to Mr. Scruggs'**
**16  offer.**

443

**6    Q   Did he [Mr. Wyatt] tell you he [Mr. Wyatt] had seen your**
**proposal?**
**7    A   No.**
**8    Q   Did you discuss anything with him [Mr. Wyatt] about it?**
**9    A   No.**

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).


**VI.   Mr. Ford  Offered  To  Work  As  A  Consultant,  Not  To  Provide  Or  Alter**
**Testimony To Benefit Plaintiffs Or Their Counsel**

419

11    Q   What does the next line of this Paragraph 10
12  say?
13    A   Making Dickie richer.
**14    Q   And tell me what that means.**
**15    A   My first reaction when I was contacted to**
**16  work with Dickie was that I had no interest in**
**17  making Dickie richer.**
**18    Q   You didn't want to make him richer?**
**19    A   No.**
**20    Q   Then why were you willing to work with him?**
**21    A   If I could help bring some resolution to**

**22  the issue, then I might participate.  But not --**
**23  just not interested in helping him make more money.**

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).

## VII.  Mr. Wyatt Was Present At The Meeting With Mr. Ford, But Did Not Negotiate Or Offer Compensation for Possible Consultation

431

14      Q   And had you had a discussion with the group or
15   any member of the group at your home on the 20th about
16   how much money you wanted per month to work as a
17   consultant?
18          MR. WYATT:  I will object; compound.
19          THE WITNESS:  **No, I did not.**

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).

## VIII.  Compensation For Consultation Did Not Come Up Until A Phone Conversation Later – One That Did Not Involve Mr. Wyatt

432

8    Q   Was this a phone conversation with Darren
9   Versiga on May 22nd?
10      A   Correct.
11      **Q   Is this the first time anybody offered you**
12   **dollars to be a consultant?**
13          MR. HAHN:  Object to form.
14          THE WITNESS:  That's a pretty broad question.  Do
15      you mean **regarding Scruggs?**
16   BY MR. ROBIE:
17      Q   Yes.
18      A   **Regarding Scruggs, yes.**
19      **Q   And the first offer they made to you was 8 to**
20   **10,000 a month?**
21      **A   Right.**

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).

## IX.  Mr. Wyatt Focused On The Substance Of Policyholder Claims, NOT Negotiating A Compensation Arrangement

445

3    Q   The next entry is what?
4    **A   8-8-06.  Derek e-mailed request for**
**5  consulting services on Mullins case.  I requested a**
**6  consulting agreement.**
7    Q   And what form did that e-mail take?
8        MR. HAHN:  Object to form.
9 BY MR. ROBIE:
10   **Q   What did he ask you to do?**
11   **A   Review a report.**
12   Q   And what did you tell him?
13   **A   I told him that I didn't have a consulting**
14  **agreement with him.**

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).


## X. Defendant Misrepresents Emails And Communications That Have Already Been The Subject of Mr. Ford's Testimony

In perhaps their most pointed attempt at portraying Mr. Wyatt's Affidavit as false, Defendants cite an email from Mr. Wyatt to Mr. Ford in which he wrote "we can do this on the consulting terms that Dick Scruggs and I discussed with you in Georgia a while back."  A review of the full record demonstrates that Mr. Wyatt was NOT referring to a payment arrangement he negotiated, because he did not negotiate such an arrangement. Further, as Mr. Ford testified, no specific payment arrangement was discussed at the meeting in Georgia by anyone.   Mr. Wyatt spoke with Mr. Ford all along about the substance of what he knew and what he could provide in the way of consultation, NOT about payment arrangements.   Discussions and proposals about compensation were between Mr. Scruggs and Mr. Ford, and never materialized in an agreement.

Not only does Mr. Ford's deposition testimony corroborate Mr. Wyatt's Affidavit, but Mr. Ford's own Affidavit is also supportive.  It is no wonder that Defendant failed to

even mention or discuss Mr. Ford's Affidavit, which further undermines its Motion to

Strike. In his Affidavit, Mr. Ford swore as follows:

> During my employment with Forensic, I did not communicate with Scruggs Katrina Group representatives.[4]
>
> At no time have I ever received any money in return for testimony.
>
> Following my employment with Forensic, <u>Richard Scruggs</u> [not Derek Wyatt] and I discussed my possible services both as an expert witness and consultant, for which I would have been compensated commensurate with my current and past salaries and experience as a professionally licensed engineer. For cases in which I would have been used as a fact witness, my only compensation would have been expense reimbursement as described in paragraph 5 above. No agreement was ever reached with Richard Scruggs or any member of the Scruggs Katrina Group as to my employment as a consultant or witness.
>
> I can recall no instance where attorney Derek Wyatt has ever offered me any fee in exchange for testimony.

*See* Brian Ford Affidavit (Attached hereto as Exhibit 2 and as an exhibit to Plaintiffs'

Responses to Defendants' Motions to Disqualify).

This account is further supported by another individual who attended the meeting

with Mr. Ford in Georgia. Zach Butterworth was an attorney independent from the SKG

at that time and who now submits an affidavit in which he also swears under oath that

Mr. Wyatt's account is correct:

> Nobody informed Mr. Ford that he would be paid for serving as a fact witness. In fact, Mr. Ford was informed that he would not be paid as a fact witness or for any testimony.
>
> At some point during that meeting, the possibility of an ongoing consulting arrangement came up. Mr. Scruggs and Mr. Ford spoke briefly

---

[4]    This is relevant and important because State Farm quotes a communication that used the phrase "highly placed insider." Regardless of the accuracy of recollections about the use of that term, it is undeniable that Mr. Ford was not employed by Forensic when he communicated with SKG attorneys. By definition he was an "outsider." There is no impropriety in speaking to former employees and Defendant's attempt to give an alternative impression is disingenuinuous.

about such an arrangement, but no specifics were discussed.  In particular, no specific compensation amounts were discussed.

**Derek Wyatt did <u>not</u> bring up the possibility of a paid consulting arrangement, <u>nor</u> did he negotiate one during that meeting or at any other time in my presence. . . .**

My understanding is that nobody consummated a consulting arrangement with Mr. Ford on behalf of SKG and that he was never paid any money.

*See* Zach Butterworth Affidavit (especially ¶¶ 6-9) (Attached hereto as Exhibit 3) (Emphasis Added).

Defendant's attempt to turn one sentence of one email into a smoking gun merely demonstrates the impropriety of taking quotes of out of context and ignoring the factual accounts provided by those who were actually there.  Defendant not only attempts to deny the veracity of Mr. Wyatt's affidavit, but also the corroborative sworn testimony of Mr. Ford and, necessarily, that of Mr. Butterworth.  Though Mr. Ford was not sure what that one sentence in the email specifically meant, he made it very clear during his testimony that the sentence did not refer to a specific payment arrangement, because he [Ford] had made a proposal that NEVER received a response:

431

```
14   Q  And had you had a discussion with the group or
15   any member of the group at your home on the 20th about
16   how much money you wanted per month to work as a
17   consultant?
18        MR. WYATT:  I will object; compound.
19        THE WITNESS:  No, I did not.
```

448

```
19   Q  Specifically, the terms, quote, we can do this
20   on the consulting terms that Dick Scruggs and I discussed
21   with you in Georgia a while back.
22        Did you have an understanding of what
23   those terms were?
24   A  No.
25   Q  Didn't mean anything to you?
```

449

1    **A   Well, I mean, we discussed developing an**
2  **agreement, but we never reached an agreement.**
3    Q   So you didn't know the dollars involved as of
4  this point?
5    A   I knew what <u>I had proposed</u>, but <u>they had</u>
6  <u>never responded</u>.

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).

**XI.  When Compensation Was Brought Up By Mr. Ford, Mr. Wyatt Did Not "Negotiate," But Instead Deferred To Mr. Scruggs**

451

6    Q   Did Mr. Wyatt respond to this e-mail?
7    A   Yes.
8    Q   And what did he respond?
9    **<u>A   He said, I put in a call to Dick Scruggs</u>. . .**

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).

**XII.  Later Discussions Between Mr. Ford And Mr. Wyatt Also Concerned Substantive Consulting, NOT Any Specific Compensation Arrangements**

452

11    **Q   Can you read that entry for me, please.**
12    **A   August 10 of '06. Derek called to say SKG**
13  **wants me as a consultant with ABC News.**
14    Q   What does that mean?
15    A   That they wanted to hire me as a
16  consultant and to participate -- they wanted me to
17  participate in this ABC News interview.
18    **Q   Did you ask him -- well, during this**
19  **conversation, did he confirm to you the rate of your**
20  **compensation?**
21    **A   <u>No.</u>**
22    **Q   Did you know at that point what it would be?**
23    **A   <u>There was no agreement</u>.**
24    **Q   What did you understand the terms of the**
25  **agreement to be as confirmed by Mr. Wyatt in this**

453

1  **August 10 conversation?**

2        MR. HAHN:  Asked and answered.

3        MR. WYATT:  And object to mischaracterizing his

4    testimony, too.

5        THE WITNESS:  <u>There is no reference in there to</u>

6    <u>any terms or agreement.</u>

7  BY MR. ROBIE:

8    Q    You just know that they wanted you as a

9  consultant, but you didn't know what you were going to be

10  paid for it?

11    A    <u>That's correct.</u>


                                453

18    Q    How about with respect to your consultation

19  with ABC?  Did you make it clear to them that you weren't

20  going to be talking to ABC unless SKG was going to pay

21  you?

22    A    Correct.

23    Q    And who did you make that clear to?

24    A    To <u>Derek.</u>

25    Q    And what did you tell him?


                                454

1    A    I basically told him that I had been

2  contacted by them and they wanted to interview me.

3    Q    And what did you say, if anything, about your

4  need to be paid?

5    A    I don't think we discussed any payments

6  regarding ABC News interviews.  <u>We discussed the</u>

7  <u>fact that we did not have a consulting agreement.</u>

8  <u>And I couldn't respond to his request for the</u>

9  <u>evaluation of the Mullins information until we had</u>

10  <u>an agreement.</u>

11    Q    How about with respect to the request that you

12  would give an interview to ABC News?

13    A    We didn't discuss.


                                455

18    Q    And was there any discussion of any of the

19  other terms of your consulting agreement that had been

20  set out in your e-mail to <u>**Dickie's**</u> office?

21    A    We didn't discuss anything other than just

22  having an agreement.

23    Q    Did he give you an explanation of why <u>they</u>

24  <u>hadn't accepted your agreement?</u>

25    A    Not at this time.


                                13

574

21    **Q    In all of the time that you have been**
22    **discussing with Derek Wyatt or anybody from Scruggs, had**
23    **anybody told you that under no circumstances could they**
24    **consider giving you any percentage of any recovery?**
25    <u>**A    We never discussed it**</u>.

575

1        MR. WYATT:  Object to the form of the question,
2    leading.
3        THE WITNESS:  <u>**We never discussed it**</u>.

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).

## XIII.  Mr. Ford's Testimony Also Demonstrates That Derek Was Not the Decision maker For  Hiring and Paying Consultants, Nor Explaining Decisions NOT to Hire Consultants

584

**17   Q    And do you expect the hold [on being hired as a consultant] to be lifted in your**
**18   lifetime?**
19    A    I would like to know the answer to that.
20    Q    **Well, why don't you ask him?**
21        MR. HAHN:  Objection.
22        **THE WITNESS:  I don't think he has an answer.**
23    BY MR. ROBIE:
24    Q    Who would have the answer?
25    **A    I don't know, but I'm not worried about**

585

1        **it. I'm moving on with my life.**

Ford Depo, January 11, 2008 (Ex. 1) (Emphasis Added).

## XIV.  When Plaintiffs' Counsel Is Afforded An Opportunity To Question Mr. Ford On The Record, That Testimony Will Further Corroborate Mr. Wyatt's Affidavit

Defendant State Farm questioned Mr. Ford for the entire day at his deposition on

January 11.  Accordingly, Plaintiffs and Mr. Wyatt have not yet had a chance to ask Mr.

Ford questions about the issues raised by State Farm.[5] When Plaintiffs and Mr. Wyatt are able to question Mr. Ford, it will only further corroborate the statements made in Mr. Wyatt's affidavit and the arguments made herein. However, even without the clarifying benefit of such additional questioning, the existing record of testimony, solely under State Farm's cross-examination, reveals that State Farm's Motion to Strike is dishonest.

## XV. State Farm's Argument Regarding The Supposed Illegality Of Payments To Fact Witnesses Is Hypocritical

SF's Motion to Disqualify is utter hypocrisy, because SF has repeatedly paid fact witnesses in Hurricane Katrina Litigation. In the *Bridgewater v. State Farm* case, U.S.D.C. for So. Dist. of Miss. docket number 1:07-cv-1273-HSO-JMR, the plaintiffs' property had been inspected by The Structures Group, who thus became a fact witness. Once in litigation, SF hired The Structures Group to be its paid consultant/expert. *See*

---

[5]     Plaintiffs' Counsel reserved the right to conduct an examination of Mr. Ford on these issues:
                617
3   THE VIDEOGRAPHER:  We are on the video record at
4      5:29 p.m.
5          MR. WYATT:  This is Derek Wyatt.  Jim Robie
6      counsel with State Farm has tendered the witness.  It
7      is 5:30 p.m. Eastern time.  All counsel have agreed
8      that we will resume this deposition on a Saturday.  And
9      we will make every good faith effort among counsel to
10     do this as promptly as possible, working within the
11     trial date of February 25th for the McIntosh case.
12     January 22nd for the Pretrial Order.  And December 15th
13     for the -- I mean, January 22nd for the pre-trial
14     conference and January 15th for the Pretrial Order
15     which is probably not realistic.  But anyway we will do
16     that.
17         And I understand David Norris wants to
18     conduct his examination on behalf of Renfroe.
19     And I want to conduct it on behalf of
20     McIntoshes and myself to the extent that any of
21     this material is directed to me.  And Ryan Hahn
22     will have questions of his own client.
23         And so if all counsel is in agreement with
24     that, we will close the record for this
25     deposition.

SF's Expert Designation, *Austin, et al v. State Farm*, U.S.D.C. for So. Dist. of Miss. docket number 1:07-cv-007-LTS-RHW.

Under its own theory of the law, SF has bribed a fact witness and, in so doing, also violated binding rules of ethics. Under SF's theory of the law, SF's Counsel should be disqualified from this and all other Hurricane Katrina litigation.

The *Austin* case is not unique. In the *Templet v. State Farm* case, U.S.D.C. for So. Dist. of Miss. docket number 1:07-cv-796-LTS-RHW, the plaintiffs' property had been inspected by The Structures Group, which again became a fact witness. Once in litigation, SF again hired the Structures Group to be its paid consultant/expert. *See* SF's Expert Designation, *Averette v. State Farm*, U.S.D.C. for So. Dist. of Miss. docket number 1:07-cv-714-LTS-RHW.

SF has engaged in similar conduct in other cases and in association with other engineering firms who were also fact witnesses. For instance, in *Gordon v. State Farm*, U.S.D.C. for So. Dist. of Miss. docket number 1:07-cv-745-LTS-RHW, the plaintiffs' property had been inspected by Wiss, Janney, Elstner & Associates. Once in litigation, SF hired Wiss, Janney, Elstner & Associates to be its paid consultant/expert. *See* SF's Expert Designation, *Alford v. State Farm*, U.S.D.C. for So. Dist. of Miss. docket number 1:07-cv-814-LTS-RHW.

In fact, for the first 19 of what is commonly referred to as the "State Farm 178 cases", State Farm has designated The Structures Group as its engineering experts in seven of the cases, and designated Wiss, Janney, Elstner & Associates as its experts in the remaining twelve cases.

In fact, under SF's theory, its own conduct is far worse than Plaintiffs' Counsel's because no consulting arrangement ever materialized between Plaintiffs' Counsel and Mr. Ford. He was never hired, never paid, and never identified as an expert. SF, in contrast, repeatedly and systematically consummated paid consulting arrangements for known fact witnesses. According to SF, what it did amounts to the buying of testimony from a fact witness in violation of the federal anti-bribery statute, 18 USC 201.

Plaintiffs respectfully submit that the Court should not tolerate SF's conduct, whereby on one hand it hires and pays fact witnesses as "experts" or "consultants" and then, on the other hand, aggressively advances its Motion to Disqualify attacking consulting arrangements with fact witnesses (including unconsummated ones). The Court and the judicial process are being abused right alongside the Plaintiffs.

## XVI. Overview and Conclusion

Viewed objectively and in context, the sequence of events as well as the roles of the participants is simple. Mr. Scruggs, Mr. Wyatt, and others approached Mr. Ford, given his knowledge of post-Katrina occurrences. They met in person on May 20, 2006, at Mr. Ford's home in Georgia.

Mr. Scruggs, Mr. Wyatt, Mr. Butterworth and Mr. Versigna were present. During that meeting, the possibility of an ongoing consulting arrangement came up. No specific compensation arrangements were presented or accepted. In particular, Derek Wyatt did not negotiate a compensation arrangement. Mr. Wyatt focused upon the substance of Katrina litigation, Mr. Ford's knowledge and his potential consulting expertise, as his affidavit clearly states. Mr. Scruggs told Mr. Ford to send him a proposal regarding a possible ongoing consulting position.

After that meeting, Mr. Ford emailed his proposal to Mr. Scruggs' office. On May 22, 2006, Mr. Ford Spoke to Mr. Versigna, which was the first time anyone offered Mr. Ford compensation in exchange for consulting. Mr. Wyatt was not a party to that call.

In the months that followed, Mr. Wyatt asked Mr. Ford for consulting assistance on several occasions. These requests for substantive assistance sometimes resulted in Mr. Ford inquiring into the status of the payment arrangement that he had submitted to Mr. Scruggs' office and that he had discussed with Mr. Versigna by phone. Mr. Wyatt simply deferred to Mr. Scruggs and maintained his focus on the substantive merits of the cases.

No consulting arrangement for compensation ever materialized. Mr. Wyatt and KLG continue litigating their cases on behalf of policyholders, and Mr. Ford has moved on with his life, as he testified.

In short, Defendant's latest attack is much ado about nothing. Mr. Wyatt did not negotiate the payment of compensation to Mr. Ford. Mr. Ford was never hired, and no payments were ever made to Mr. Ford. Further, even if Mr. Ford had been hired and paid (which is not the case), such a consulting arrangement would have been proper under the law. *See Prasad, et al., v. MML Investors Services, Inc., 2004 U.S. Dist. LEXIS 9289, *19 (S.D.N.Y.)* ("That a fact witness has been retained to act as a litigation consultant does not, in and of itself, appear to be improper, absent some indication that the retention was designed as a financial inducement or as a method to secure the cooperation of a hostile witness, or was otherwise improper.") *See also Barrett Industrial Trucks, Inc. v. Old Republic Ins. Co.*, 129 F.R.D. 515, 517 (N.D. Ill. 1990) (Accepting the propriety of a party hiring a former employee who was also a fact witness in the litigation as a litigation

18

consultant); *and In re Gulf Oil/Cities Serv. Tender Offer Litig.,*1990 U.S. Dist. LEXIS 9082, Nos. 82 Civ. 5253 (MBM) & 87 Civ. 8982 (MBM), 1990 WL 108352, at *1 (S.D.N.Y. July 20, 1990) (same).[6]

As stated in Plaintiffs' Response Brief and above, Defense Counsel are experienced lawyers who know or should know the law on this issue. Defense Counsel have remained strangely silent about their own practices. To the extent that there is any hypocrisy on this issue, Rule 11 sanctions would be warranted. The question remains: Where are the affidavits from John Banahan and all of Defendants' Counsel swearing that they have never paid any fact witness in any case (including but not limited to treating physicians in medical or injury cases) for their time, expertise, and consultation?

Aside from the law's allowance for hiring consultants who may also be fact witnesses, the undisputed facts as recounted by those who were present demonstrate that Mr. Wyatt did not negotiate a payment arrangement with Mr. Ford. He remained focused on the facts of his client's cases.

Defendants' displeasure with Mr. Wyatt's affidavit or the testimony of Mr. Ford does not change the facts. And, such displeasure falls far short of the standard for striking an affidavit. Plaintiffs respectfully request that the Court expeditiously deny Defendants' Motion to Strike for all of the reasons set forth herein.

Further, Plaintiffs respectfully ask the Court to expeditiously deny Defendants' MTDQs for all of the reasons set forth in Plaintiffs' Responses and because Defendants and their Counsel have made it abundantly clear that they will not stop this abusive

---

[6]     *See also Goldstein v. Exxon Research & Eng'g Co.*, 1997 U.S. Dist. LEXIS 14600, 19-20 (D.N.J. 1997) ("...it is the witness's credibility which is affected by a payment agreement. Numerous criminal cases stand for the same proposition... ").

litigation tangent until the Court denies their Motions. Defendants have their litigation machine in high gear and appear intent on filing paper with the Court and needlessly expending the time, resources, and focus of all involved on issues other than the merits of these Mississippi policyholders' cases.[7]

Respectfully submitted, this 19th day of February, 2008.

THOMAS C. and PAMELA McINTOSH, PLAINTIFFS

/s/ Don John W. Barrett
Don John W. Barrett (MS Bar No. 2063)
Barrett Law Offices, P.A.
P.O. Drawer 987
Lexington, MS  39095
Phone:  662-834-2376
Facsimile:  662-834-2628

OF COUNSEL:

Mary E. McAlister

---

[7]     Defendant's accusations regarding the accuracy of Mr. Wyatt's affidavit have proven false. Nonetheless, Defendant's pattern of incessant briefing in Hurricane Katrina litigation will likely not stop now, not even on this issue.

Now, Defendant will likely file a Reply that uses vitriol and further unfounded accusations rather than admitting the consistency of the factual record by Mr. Ford, Mr. Wyatt, and Mr. Butterworth - individuals who actually have personal knowledge, unlike State Farm and its cadre of lawyers. In addition to its probable supply of additional misconstrued statements and emails relating to the Ford-Wyatt interaction, Defendant will probably attempt to toss in unrelated accusations pertaining to issues altogether different than the limited focus of State Farm's improper Motion to Strike. Plaintiffs respectfully request that State Farm be restricted to the issue it raised.

For the last few months, State Farm has attempted to capitalize on the Scruggs indictment and use it as a vehicle to stir up the media, blogs, and the Courts. While the press and especially the blogs may sometimes help give life to unwarranted speculation and unsupported accusations, the Courts and the judicial process should not be so abused. There will be a trial regarding Mr. Scruggs and his indictment, but it will not and should not be conducted in this case, which is supposed to be about these policyholders' claims.

The issue before the Court in this latest Motion is narrow. Defendant accused Mr. Wyatt of submitting a false affidavit. It is State Farm's attorneys John Banahan and Dan Webb – who heard Mr. Ford's corroborative testimony first-hand and should have known of the accuracy of Mr. Wyatt's affidavit – who have been dishonest. By filing a Motion that is contrary to the facts and the stringent legal standard for a motion to strike, they have damaged their own credibility, not that of Mr. Wyatt. The hyperbole and inaccuracy of the briefing on this narrow issue is emblematic of the hyperbole and inaccuracy that pervades Defendant's presentation of the facts and the law in its broader Motion to Disqualify.

Justice will be served when these proceedings are no longer hijacked by the Defendants' obsessive chasing of disqualification rabbit trails, when their Motions to Disqualify have been properly denied for the second time in line with Judge Senter's initial ruling, and when the focus of the Court and all Parties return to the insurance-related legal claims at hand.

Derek A. Wyatt
David Neil McCarty
Nutt & McAlister, P.L.L.C.
605 Crescent Blvd, Suite 200
Ridgeland, MS  39157
Phone:  601-898-7302
Facsimile:  601-898-7304

Don John W. Barrett
David Malcolm McMullan, Jr.
Barrett Law Offices, P.A.
P.O. Drawer 987
Lexington, MS  39095
Phone:  662-834-2376
Facsimile:  662-834-2628

Dewitt M. Lovelace
Lovelace Law Firm, P.A.
36474 Emerald Coast Parkway, #4202
Destin, FL  32541
Phone:  850-837-6020
Facsimile:  850-837-4093
E-Mail:  dml@lovelacelaw.com

Zach Butterworth
Michael Hesse
Gary Yarborough, Jr.
Hesse & Butterworth, PLLC
841 Highway 90
Bay St. Louis, MS  39520
Phone:  228-466-0020
Facsimile:  228-466-0550
E-Mail:  zbutterworthlaw@bellsouth.net

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2008, I electronically filed the foregoing with the Clerk of the Court using the Court's ECF system which sent notification of such filing to all counsel of record.

This the 19th day of February, 2008.

/s/ Don John W. Barrett
Don John W. Barrett (MS Bar No. 2063)
Attorney for Plaintiffs